AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Northern District of California

**FILED**

APR 29 2019

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| LUIS ANGEL TORRES-GARCIA aka GUERO | )   Case No. |
| | ) |
| | ) |
| *Defendant(s)* | 3 19 70657 **MAG** |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___8-30-2017 thru a date unknown___ in the county of ___Contra Costa, Solano, et al___ in the

___Northern___ District of ___California___ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 USC 846 and 841(b)(1)(C) | Conspiracy to distribute and possess with the intent to distribute controlled substances |
| | Max. penalties: 20 years' imprisonment; minimum 3 years and max lifetime supervised release; $1 million fine; $100 special assessment; forfeiture; denial of federal benefits; immigration consequences including potential deportation |

This criminal complaint is based on these facts:

SEE AFFIDAVIT OF DEA SPECIAL AGENT MATT SHAW

☑ Continued on the attached sheet.

Approved as to form _____
AUSA Casey Boome

_____
*Complainant's signature*

MATT SHAW, DEA SPECIAL AGENT
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___4-29-19___

_____
*Judge's signature*

City and state: ___San Francisco, CA___

Jacqueline S. Corley, U.S. Magistrate
*Printed name and title*

1 — MJS

## AFFIDAVIT OF MATTHEW SHAW
## IN SUPPORT OF COMPLAINT AND SEARCH WARRANT APPLICATION

### INTRODUCTION

I, Matthew P. Shaw, a Special Agent of the Drug Enforcement Administration, being first duly sworn, hereby declare as follows:

1.      I make this affidavit in support of an application for a criminal complaint charging the following persons with Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances in violation of 21 U.S.C. §§ 846 and 841(a)(1), as set forth in the table below:

| Defendant | Statute(s) Violated by this Defendant | Paragraphs Setting Forth Probable Cause |
|---|---|---|
| Jose Ramon DELGADILLO, aka "Tepa" | 21 U.S.C. § 846 | 98-102, 108-113, 122-134 |
| Marco Antonio DELGADILLO, aka "Tonio" | 21 U.S.C. § 846 | 98, 109-110, 122-128 |
| Lorenzo Edward LEE, aka "O.G." | 21 U.S.C. § 846 | 25-34, 40, 50-64, 75-87, 98-121, 143-182 |
| Anthony BROWN, aka "Ant Man" | 21 U.S.C. § 846 | 57-64, 77-87, 104-108, 171, 176-182, 188-194 |
| Luis Angel TORRES-GARCIA, aka "Guero" | 21 U.S.C. § 846 | 122-134, 214-216 |
| Evan Deandre MARTINEZ-DIAZ | 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) | 157-175, 212-213 |
| Jeffrey Allen MCCOY | 21 U.S.C. § 846 | 25-97, 135-142, 168, 186 |
| Deshawnte GAMBOA | 21 U.S.C. § 846 | 50-64, 71-72, 82, 88-97, 135-142, 211 |

2.      This Affidavit is also submitted in support of an application for warrants to search the following premises (the "Target Premises"), more fully described in Attachments A-1 through A-9, for the items specified in Attachments B-1 and B-2 and to seize items that are fruits, evidence, and/or instrumentalities of violations of 21 U.S.C. §§ 846, 841(a)(1), and 843(b) (the "Target Offenses").   The premises to be searched are as follows:

**Target Premises #1**: 4608 Nopah St., Antioch, California (Residence of Lorenzo LEE)

**Target Premises #2**: 696 Carpino Ave., Pittsburg, California (Residence of Jeffrey MCCOY)

1

**Target Premises #3**: 3605 Baywood Cir., Antioch, California (Residence of Timothy

PEOPLES

**Target Premises #4**: 1064 Clearland Dr., Bay Point, California (Residence of Anthony

BROWN)

**Target Premises #5**: 698 Carpino Ave., Pittsburg, California (Residence of Kevin MCCOY)

**Target Premises #6**: 3412 Serpentine Dr., Antioch, California (Residence of Deborah POLK)

**Target Premises #7**: 292 Balsam St., Pittsburg, California (Residence of Deshawnte GAMBOA)

**Target Premises #8**: 21 Inlet Dr., Bay Point, California (Residence of Evan Deandre

MARTINEZ-Diaz)

**Target Premises #9**: 1110 Pacific Ave., Rio Dell, California (Residence of Luis Angel

TORRES-GARCIA)

3.       This affidavit seeks permission to seize from the Target Premises evidence of the Target

Offenses according to two different versions of Attachment B (B-1 and B-2).   Both Attachments

are appended hereto for the Court's review.   Attachment B-1 allows the seizure of any and all

evidence relating to the Target Offenses, including controlled substances.   Attachment B-2 is

less inclusive, allowing the seizure of records and/or documents constituting evidence of the

Target Offenses.   The following table sets forth the relevant attachments for each Target

Premises:

| Location | Relevant Attachments | Paragraphs Setting Forth Probable Cause |
|---|---|---|
| Target Premises #1 | A-1 and B-1 | 25-27, 50, 58, 77, 101-111, 113, 117-119, 157-175, 185 |
| Target Premises #2 | A-2 and B-1 | 28, 37, 41, 45, 48, 50-51, 60, 67, 71, 77, 81, 90, 186 |
| Target Premises #3 | A-3 and B-1 | 176-177, 181, 187 |
| Target Premises #4 | A-4 and B-1 | 188-194 |
| Target Premises #5 | A-5 and B-2 | 195-200 |
| Target Premises #6 | A-6 and B-2 | 105, 201-210 |
| Target Premises #7 | A-7 and B-2 | 51, 88, 91, 95-97, 211 |
| Target Premises #8 | A-8 and B-1 | 170, 212-213 |
| Target Premises #9 | A-9 and B-1 | 128, 214-216 |

4.     As described in Attachments B-1 and B-2, this application seeks permission to search for items that might be found on or in the Target Premises.   With respect cellular telephones, computers, and other electronic storage devices, this application seeks authorization to seize these items in order to preserve any evidence.   Any searches of cellular telephones, computers, and electronic storage devices will require additional warrants.

5.     As described in Attachments A-1 through A-9, where applicable, the place to be searched shall include all storage areas and spaces, outbuildings, closets, garages—whether attached or detached—and any containers, vehicles, and yard areas associated with the place described in Attachments A-1 through A-9 or within the curtilage, including vehicles parked in parking spaces dedicated to the Target Premises, vehicles whose keys are present in the Target Premises, or vehicles for which there is indicia of ownership, registration, or use found at the Target Premises.

6.     As discussed below, each of the Target Premises is being used by a person participating in or associated with a long-running drug trafficking conspiracy.   As discussed below, we have evidence that each of these persons continues to reside at or use the location in question.[1]

---

[1]   I have been advised that courts have recognized that, in the case of long-running drug operations, it can reasonably be inferred that evidence is likely to be found in the residences of the conspirators and that this evidence may be kept there for a long period of time.   On this issue, the Ninth Circuit has stated the following:

> [A] magistrate is allowed to draw the reasonable inference that "[i]n the case of drug dealers, evidence is likely to be found where the dealers live."   Moreover, we require "only a reasonable nexus between the activities supporting probable cause and the locations to be searched."
>
> ....
> Last, this Court has concluded that in cases involving ongoing narcotics businesses, lapses of several months—and up to two years in certain circumstances—are not sufficient to render the information in an affidavit too stale to support probable cause.

*United States v. Fernandez*, 388 F.3d 1199, 1254 (9th Cir. 2004) (internal citations omitted).

## A.    AGENT BACKGROUND

7.      I am a Special Agent with the United States Department of Justice, Drug Enforcement Administration ("DEA"), and have been so employed since August 2015.   I am currently assigned to the San Francisco Field Division of the DEA, Oakland Resident Office (Oakland RO) in California.   I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrest for, offenses enumerated in Title 18, United States Code, Section 2516.

8.      Once I joined the DEA, I successfully completed an eighteen-week DEA Basic Agent Training Academy at the DEA Academy in Quantico, Virginia. This training included instruction in the investigation of federal drug violations, including, but not limited to Title 21, United States Code, Sections 841 and 846.   Additionally, this training included several hundred hours of comprehensive, formalized instruction in, but not limited to, narcotics investigations, drug identification, detection, interdiction, financial investigations and money laundering, identification and seizure of drug related assets, undercover operations, and electronic and physical surveillance procedures.

9.      During the course of my employment as a DEA Special Agent, I have participated in over ten (10) narcotics investigations either as a case agent or in a supporting role.   I have debriefed defendants, confidential sources, and witnesses who had personal knowledge regarding narcotics trafficking organizations.   I also have participated in many aspects of drug investigations including, but not limited to, undercover operations, telephone toll analysis, records research, and physical and electronic surveillance.   I have assisted in court-ordered wiretap investigations, and I have participated in the execution of numerous federal and state narcotics search and arrest warrants that resulted in the arrest of suspects and seizure of narcotics.

10.     I have conducted and been involved in numerous narcotics and financial investigations regarding the unlawful manufacture, possession, distribution, and transportation of controlled substances, as well as related money laundering statues involving the proceeds of specified

unlawful activities and conspiracies associated with criminal narcotics.   In the course of these investigations, I have investigated crimes in violation of Title 21.

11.     I have initiated and/ or participated in approximately four (4) Organized Crime Drug Enforcement Task Force (OCDETF) investigations.   The OCDETF program is part of the United States Attorney General's strategy to reduce the availability of drugs by disrupting major trafficking organizations through joint collaborations across agencies.

12.     For the past several years, I have worked with other experienced agents, law enforcement officers and prosecutors on cases that apply use of electronic surveillance to investigate drug trafficking organizations that are trafficking narcotics internationally and/or across multiple jurisdictions within the United States.

13.     Through my training, education, experience, and my discussions with other experienced agents and officers who conduct drug investigations, I have become familiar with narcotics traffickers' use of mobile telephones and mobile telephone applications, Internet applications, social media applications, as well as narcotics traffickers' use of numerical codes and code words to conduct business.   Also, I have become familiar with narcotics traffickers' methods of operations, including, but not limited to, the manufacturing, distribution, storage, and transportation of narcotics, and the methods used by drug traffickers to collect, transport, safeguard, remit, and/or launder drug proceeds.

14.     The facts stated in this affidavit are based on my personal knowledge, on my review of reports prepared by other law enforcement officers and records prepared by others, and on conversations I have had with other law enforcement officers and witnesses involved in this investigation.   Because this affidavit is submitted for the limited purpose of securing authorization for a search warrant, I have not included every fact and detail known to me or law enforcement.   Rather, I have set forth only those facts that I believe are sufficient to support the requested warrant.   Unless otherwise indicated, where actions, conversations, and statements of others are related herein, they are related in substance and in part.

**B.   RELEVANT STATUTES**

15.     Pursuant to Title 21, United States Code, Section 841(a), it is unlawful for any person to "knowingly or intentionally ... manufacture, distribute or dispense, or possess with the intent to manufacture, distribute, or dispense a controlled substance."

16.     Pursuant to Title 21, United Sates Code, Section 846, it is unlawful for any person to attempt or conspire to commit any offense defined in this subchapter.   Sections 841(a) discussed above falls within this subchapter.

17.     Pursuant to Title 21, United States Code, Section 843(b), it is unlawful for any person to use a communication facility (such as a telephone) to facilitate the commission of a felony under the Controlled Substances Act.

**C.   FACTS ESTABLISHING PROBABLE CAUSE**

**Overview of the Investigation**

18.     In February 2017, agents from the DEA, the United States Internal Revenue Service, the Bureau of Alcohol, Tobacco, Firearms, and Explosives, Antioch Police Department, Oakley Police Department, and Concord Police Department began a joint investigation into the drug trafficking activities of Lorenzo LEE, his customers and sources, and other persons assisting in the drug trafficking enterprise (collectively, "the DTO").

19.     In August of 2017, investigators conducted a series of controlled narcotics purchases from Jeffrey Allen MCCOY after obtaining information about MCCOY's drug trafficking activities through a confidential source ("CS-2") associated with the Antioch Police Department. Detectives with the Antioch Police Department further advised agents that CS-2 could introduce a DEA confidential source ("CS-3") to MCCOY as a potential new customer.

20.     Subsequently, through the use of the confidential sources, law enforcement made the following eight controlled purchases of narcotics from MCCOY:

| DATE | EVIDENCE PURCHASED | PRICE |
|------|--------------------|-------|
| 8/30/2017 | 55.5 grams (net weight) of cocaine hydrochloride | $1,600.00 |
| 9/6/2017 | 56.3 grams (net weight) of cocaine base | $1,700.00 |
| 9/28/2017 | 49.2 grams (net weight) of heroin | $1,600.00 |
| 11/2/2017 | 248.6 grams (net weight) of cocaine hydrochloride | $6,750.00 |
| 12/7/2017 | 48.8 grams (net weight) of heroin | $1,600.00 |
| 1/11/2018 | 52.3 grams (net weight) of cocaine base | $1,600.00 |
| 4/27/2018 | 256.4 grams (net weight) of cocaine base | $6,750.00 |
| 8/13/2018 | 205.8 grams (net weight) of heroin | $7,000.00 |

21.     The first transaction was a purchase of drugs by two informants, CS-2 and CS-3.   All the subsequent transactions were purchases from MCCOY by CS-3.   These transactions are described in more detail below.

22.     In furtherance of their investigation of the LEE DTO, agents obtained the following federal wiretap orders to monitor communications over telephones used by the conspirators.

    a.   On April 20, 2018, United States District Judge Edward M. Chen signed an order authorizing the interception of wire communications over telephone number 925-812-0709, believed to be used by MCCOY (hereinafter "TT-1"), and wire and electronic communications over telephone number 925-642-2806, believed to be used by Lorenzo LEE (hereinafter "TT-2").   In addition, this order authorized agents to obtain physical data location for both TT-1 and TT-2 for a period of 30 days.

    b.   On July 19, 2018, Judge Chen signed an order authorizing the reinitiation of interception of wire communications over TT-1, initiation of interception of electronic communications over TT-1, reinitiation of interception of wire and electronic communication over TT-2, initiation of interception of wire communications over 925-848-8743 believed to be used by LEE (hereinafter "TT-3"), and initiation of wire and electronic communications over 707-862-6874 believed to be used by Jose DELGADILLO (hereinafter "TT-4").   In addition, this order authorized agents to obtain

physical data location for TT-1, TT-2, TT-3, and TT-4.

c. On January 17, 2019, Judge Chen signed an order authorizing the reinitiation of interception of wire and electronic communication over TT-2, initiation of interception of wire communications over 925-470-5201 believed to be used by LEE (hereinafter "TT-5"), and reinitiation of wire and electronic communications over TT-4.   In addition, this order authorized agents to obtain physical data location for TT-2, TT-4, and TT-5.

23.     Based on the investigation to date, I have learned the following regarding the LEE DTO:

a. LEE is a cocaine source of supply for MCCOY, Kevin MCCOY, Timothy PEOPLES, and other apparent street-level dealers in the DTO;

b. Suppliers in Mexico coordinate narcotics trafficking activities between LEE, DELGADILLO, and others in the DTO;

c. DELGADILLO traffics in multiple types of narcotics and is one of LEE's narcotics sources of supply;

d. The DTO uses coded terminology to discuss narcotics and cash;

e. The DTO has access to and traffics in methamphetamine, cocaine, crack cocaine, black-tar heroin, and heroin mixed with fentanyl.

24.     During the course of the investigation, agents have seized significant quantities of narcotics from various members of the DTO.   The following chart summarizes the seizures, which are discussed in more detail in this affidavit:

| DATE | SEIZED | CIRCUMSTANCES |
|---|---|---|
| 5/15/2018 | 4 kg of heroin mixed with fentanyl and $46,000 | Seized from courier after leaving LEE's residence |
| 8/8/2018 | 18 lbs of methamphetamine | Seized en route to TORRES-GARCIA from DELGADILLO |
| 1/26/2019 | 2 kg of cocaine | Seized en route to meeting point with LEE |
| 2/9/2019 | 7 kg of cocaine and $104,505 | Seized from courier after leaving LEE's residence |
| 2/9/2019 | 20 lbs of methamphetamine and 1 kg of cocaine | Discarded from courier's vehicle after leaving LEE's residence |

### D.   CONTROLLED PURCHASES AND SEIZURES OF NARCOTICS

**August 30, 2017: CS-2 and CS-3 Purchase of Cocaine from MCCOY, and LEE**
**Supplies MCCOY with Drugs for the Transaction**

25.      On August 30, 2017, law enforcement investigators arranged for a controlled purchase of
cocaine by CS-2 and CS-3 from MCCOY, during which CS-2 would introduce CS-3 to
MCCOY.   In connection with this operation, law enforcement investigators established
surveillance in the area of a Hampton Inn located at 1201 California Avenue, Pittsburg,
California, where it was anticipated the controlled purchase would take place, and in the area of
LEE's residence, **Target Premises #1.**

26.      Prior to the planned transaction, agents met with CS-2 and CS-3 at a neutral location in
Antioch, California.   During the meeting, and at law enforcement's direction, CS-2 called
MCCOY at TT-1 and arranged for a meeting between CS-2 and MCCOY, requesting to purchase
cocaine from MCCOY.   During the call, CS-2 informed MCCOY that he/she would be bringing
another customer to the transaction.   During the meeting at the neutral location, agents were
informed by the Antioch Police Department that MCCOY had indicated to CS-2 that he might
have to travel to the Hillcrest Avenue area in Antioch, California to get the agreed upon two
ounces of cocaine—which MCCOY would be providing to CS-2 as part of the transaction.
LEE's residence, **Target Premises** #1, is less than one mile from Hillcrest Avenue.   According
to telephone toll records, at approximately 12:11 pm, MCCOY (TT-1) called LEE (TT-2).   The
phone call lasted approximately 22 seconds.

27.      At approximately 12:25 pm, surveillance units observed LEE get into a silver Hyundai,
bearing California license plate 7GKG170, registered to Patrice Maxwell at **Target Premises #1.**
At approximately 12:30 pm, MCCOY (TT-1) called LEE (TT-2) twice.   The first phone call
lasted approximately 16 seconds, and the second phone call lasted approximately 13 seconds.
Moments later, surveillance units observed LEE as the sole occupant of the silver Hyundai,
turning onto Hillcrest Avenue, Antioch, California, in the direction of California Highway 4.   At
that time, law enforcement was unable to maintain surveillance on LEE, as LEE was driving

erratically, apparently conducting counter surveillance maneuvers.

28.     About twenty-four minutes later, at approximately 12:54 pm, agents observed a blue

Nissan Maxima, bearing California license plate 7LPD611 and registered to MCCOY at his

residence (**Target Premises #2**), park next to CS-2's vehicle in the parking lot of the Hampton

Inn located at 1201 California Avenue.   CS-2 and CS-3 were already present at the Hampton Inn

parking lot.   Moments later, CS-3 provided CS-2 with $1,600.00 for the narcotics, and CS-2 got

into MCCOY's vehicle.   CS-3 remained in CS-2's vehicle.   CS-2 purchased two ounces of

suspected cocaine from MCCOY inside MCCOY's Nissan Maxima and provided MCCOY with

the $1,600.00 that CS-3 had given CS-2.

29.     Following the transaction within MCCOY's vehicle, CS-2 got out of MCCOY's vehicle

and got back into CS-2's vehicle.   CS-3 then exited CS-2's vehicle and met with MCCOY.

During the meeting, which was covertly recorded,[2] MCCOY informed CS-3 that crack cocaine

would cost approximately $850.00 per ounce and that he could lower the price of powdered

cocaine if CS-3 purchased more.   MCCOY also informed CS-3 that he could obtain a kilogram

of heroin, if CS-3 requested it.   MCCOY informed CS-3 that he had an individual who MCCOY

referred to as "my man" who could provide MCCOY with large amounts of narcotics, if CS-3

requested it.   During the conversation with CS-3, MCCOY informed CS-3 that he was going to

meet with "my man" following the meeting, and MCCOY pointed in the direction of the adjacent

Jack-in-the-Box parking lot, located at 1213 California Avenue.

30.     At approximately 12:57 pm, surveillance units observed the silver Hyundai driven by

LEE arrive and park at a Chevron gas station located at 1235 California Avenue, which is

adjacent to both the Hampton Inn, at which the controlled purchase operation was taking place,

and the Jack-in-the-Box, at which MCCOY mentioned he would be meeting "my man."

31.     At 1:03 pm, agents observed MCCOY's Nissan park at the stall at Chevron directly

across from the silver Hyundai driven by LEE.   At that time, LEE was observed outside of the

---

2 Prior to each controlled purchase operation, CS-3 was provided with a covert transmitting/recording device for
evidentiary purposes as well as safety.

silver Hyundai pumping gas.   Moments later, surveillance units observed MCCOY and another individual (later identified as Juan Maurice McCoy) walk towards LEE.   As they met, LEE handed Juan McCoy a small black case with white lettering, which Juan McCoy then placed into the front passenger seat of the blue Nissan.   MCCOY then entered the front passenger seat of the silver Hyundai and LEE entered the front driver side of the silver Hyundai.   MCCOY and LEE appeared to converse inside LEE's vehicle for several minutes before MCCOY exited the car.

32.     Based on my training and experience and discussions with other experienced agents, it is common practice for sources of supply to meet with their street-level dealers in private, in order to keep their relationship and identities secret from other customers, dealers, and law enforcement investigators.   This practice also helps to safeguard the operations and movement of narcotics as well as money through the organization.   At approximately 1:10 pm, law enforcement investigators observed MCCOY and Juan McCoy depart the area in MCCOY's vehicle, while LEE departed the area in his vehicle.

33.     I believe that LEE was MCCOY's cocaine source of supply for this transaction.   It is common practice for drug dealers to meet with their sources of supply before and/or after narcotics transactions.   I believe that MCCOY and LEE met after the drug deal so MCCOY could provide LEE with the $1,600.00 that CS-2 provided MCCOY in exchange for the suspected cocaine during the controlled purchase operation.   I know from my experience investigating drug trafficking that it is common for distributors who have a relationship with their source of supply to be "fronted" drugs, or given drugs in advance on a credit basis, so that they can later be sold.   The distributors then repay their source of supply at a later time for the drugs using the profits from the distributor's sales.   "Fronting" is common practice because distribution-quantities of drugs can cost thousands or tens of thousands of dollars, and distributors may not have the cash to pay for these drugs up front.

34.     Following the controlled purchase transaction, the suspected crack cocaine was sent to the DEA's Western Laboratory for forensic chemical analysis.   The results of the chemical

11

analysis confirmed that the substance, which had a net weight of approximately 55.5 grams, contained cocaine base with an approximate substance purity of 70%, yielding an amount of pure cocaine base of approximately 38.8 grams.

### September 6, 2017: CS-3 Purchase of Crack Cocaine from MCCOY

35.     On September 6, 2017, agents met with CS-3 and directed CS-3 to contact MCCOY on TT-1 and arrange for a meeting with MCCOY at a Home Depot located at 2300 N. Park Blvd., Pittsburg, California, to purchase two ounces of crack cocaine.   During the phone call, MCCOY informed CS-3 that he had in his possession the two ounces of crack cocaine that CS-3 had requested.   The telephone call, which started at approximately 1:51 pm, was consensually recorded.   A portion of the conversation proceeded as follows:[3]

| | |
|---|---|
| CS-3: | I need like two hard. |
| MCCOY: | Like two. What is two? |
| CS-3: | Two O hard man. |
| MCCOY: | Oh, this the O.G. dude ! |
| CS-3: | Yeah this ain't your mother fucking uncle man? |
| MCCOY: | Oh, okay. Yeah, it's all good. Yeah I got you. I should have it right now. |
| CS-3: | You told me ah..., ah..., ah..., eight and a half, so I got like, I got 17 for you. |
| MCCOY: | Yeah, it's all good. |
| CS-3: | ...can we meet at that Home Depot by Loveridge. |
| MCCOY: | Yeah |
| CS-3: | How long you talking? |

---

[3] The partial transcripts of consensually recorded telephone conversations in this affidavit are based on our current understanding of the conversations between CS-3 and MCCOY and may be amended in the future after further review and/or based on additional information.   In some cases, portions of the conversations are inaudible, slurred, faded out, or mumbled.

| MCCOY: | Let me go grab it and make sure I got it, hold on a minute. Yeah I got you. |
| CS-3: | Okay so I…, I'll be floating in about 20 minutes man I can be there. |
| MCCOY: | …let me know when you like 3 minutes away, I'm right down the street. |

36.   In this conversation, I believe MCCOY was offering to sell one ounce of crack cocaine for $850.00, totaling $1,700.00 for two ounces.   I believe that the prices MCCOY offered to CS-3 are consistent with current pricing for ounce-quantities of crack cocaine in the San Francisco Bay Area.   I also know that "O" is slang for an ounce and "hard" is slang for crack cocaine.

37.   At approximately 2:00 pm, agents established surveillance in the area of MCCOY's residence, **Target Premises #2**, in anticipation of the drug transaction involving CS-3 and MCCOY.   At approximately 2:22 pm, surveillance units observed the blue Nissan Maxima registered to MCCOY depart the residence with two male occupants inside, later identified as MCCOY and Juan Maurice McCoy

38.   CS-3 then placed two consensually recorded calls to MCCOY, who was using TT-1. During the first call, CS-3 informed MCCOY that he/she was parked in the Home Depot parking lot.   MCCOY responded that he would be right there.

39.   Surveillance units followed MCCOY to the Home Depot.   At approximately 2:25 pm, agents observed MCCOY's Nissan park next to CS-3's vehicle.   Surveillance units then observed MCCOY exit his vehicle and enter CS-3's vehicle.   Juan Maurice McCoy was also seen exiting the Nissan Maxima but waited outside the vehicle in what appeared to be a "lookout" capacity.[4]   During the meeting, CS-3 gave MCCOY $1,700.00 and MCCOY provided CS-3 with two ounces of suspected crack cocaine.   The meeting was covertly recorded through equipment in CS-3's possession.

---

[4] Based on my training and experience, a "lookout" is an accomplice who alerts drug dealers to the presence of police.

40.     During the meeting, MCCOY informed CS-3 that the crack cocaine was a gram over the negotiated amount and weighed more than two ounces.   MCCOY also said that the individual with him (referring to Juan McCoy.) was his cousin.   MCCOY informed CS-3 that he always possessed small amounts of narcotics, but would have to contact his source of supply if CS-3 wanted a larger amount of narcotics.   In terms of his (MCCOY's) ability to obtain larger amounts, MCCOY told CS-3 that "my man is the man."   Based on the investigation, I believe that LEE is MCCOYs source of supply and the individual who MCCOY refers to as "my man."

41.     At approximately 2:28 pm, surveillance units observed MCCOY exit CS-3's vehicle. MCCOY and Juan McCoy then departed the area in the Nissan and returned to MCCOY's residence, **Target Premises #2**.

42.     Following the controlled purchase transaction, the suspected crack cocaine was sent to the DEA's Western Laboratory for forensic chemical analysis.   The results of the chemical analysis confirmed that the substance, which had a net weight of approximately 56.3 grams, contained cocaine base with an approximate substance purity of 52%, yielding an amount of pure cocaine base of approximately 29.2 grams.

### September 28, 2017: CS-3 Purchase of Heroin from MCCOY

43.     On September 28, 2017, at approximately 1:30 pm, agents followed CS-3 to the prearranged meet location for the operation, the same Home Depot parking lot used in the previous transaction on September 6, 2017.   At approximately 1:48 pm, CS-3 placed a recorded telephone call to MCCOY at TT-1:

|         |         |
|---------|---------|
| MCCOY:  | Hello?  |
| CS-3:   | Playboy! |
| MCCOY:  | What's up? |
| CS-3:   | What's going on wit' you man? |
| MCCOY:  | Same old, same old. |
| CS-3:   | It's good, everything good? |

| | |
|---|---|
| MCCOY: | Yup, what you trying to get? |
| CS-3: | Okay, well I need, I need two blacks man. |
| MCCOY: | Yup, I got two for you. |
| CS-3: | Alright ah…, ah…, ah…, I'll be at the spot in like 5 minutes man. |
| MCCOY: | Alright ah…, ah…, where at?   Oh yeah, that same spot? |
| CS-3: | Yeah, yeah, yeah. |
| MCCOY: | Okay. What you know the number on it? |
| CS-3: | Huh? Yeah 16. |
| MCCOY: | Huh? |
| CS-3: | You told me 16. |
| MCCOY: | You said 15? |
| CS-3: | You said 16. |
| MCCOY: | Yeah, all right, yeah. I'll do that. |
| CS-3: | Okay. |
| MCCOY: | Yeah, give me like 12 minutes. |
| CS-3: | Alright, alright. |

44.     Based on my conversations with CS-3, my review of the recordings, and my experience conducting drug trafficking investigations, I know that CS-3 asked for two ounces of heroin, which I believe MCCOY was offering to sell for $800.00 per ounce, totaling $1,600.00.   That price is consistent with current pricing that I have seen for ounce-quantities of heroin in the area. I further know that "black" is slang for black-tar heroin, which is a hard, black substance that appears as tar when manufactured and prepared for distribution.

45.     Prior to CS-3 placing the calls to MCCOY that day, law enforcement investigators had established surveillance at **Target Premises #2**.   At approximately 1:55 pm, agents observed MCCOY depart **Target Premises #2**, enter his Nissan Maxima, and drive away.

46.     Surveillance units thereafter followed MCCOY to the Home Depot parking.   At approximately 2:15 pm, agents observed MCCOY's Nissan park next to CS-3's vehicle.

Surveillance units then observed MCCOY enter CS-3's vehicle. During the recorded meeting, CS-3 gave MCCOY $1,600.00 and MCCOY provided CS-3 with two ounces of heroin. The meeting was covertly recorded through equipment in CS-3's possession.

47.     During the meeting, CS-3 asked MCCOY about the purchase price for a "9 pack of hard," a slang term referring to nine ounces of cocaine base (also known as crack cocaine). MCCOY told CS-3 nine ounces of crack cocaine would cost approximately $775.00 per ounce. CS-3 asked if MCCOY could give him/her the drugs at a price of $750.00 per ounce. MCCOY responded he could not, unless MCCOY received CS-3's money first and then "cooked" up all nine. I know that "cooked" is a reference to the physical act of manufacturing cocaine into crack cocaine by cooking it. Typically, the cocaine powder is dissolved in a mixture of water and sodium bicarbonate. The mixture is boiled to separate the solids and then cooled to create crack cocaine.

48.     Agents observed MCCOY exit CS-3's vehicle. As MCCOY was exiting the vehicle, he informed CS-3 that the heroin was "48.8" (grams). As MCCOY was driving away, CS-3 yelled towards MCCOY and asked why the weight of the heroin was 48.8. MCCOY responded that an ounce of heroin was "twenty four grams a zip."[5] Soon thereafter, agents observed MCCOY exit CS-3's vehicle, enter the Nissan Maxima, and depart the area. At approximately 2:25 pm, law enforcement investigators observed MCCOY return to **Target Premises #2.**

49.     Following the controlled purchase transaction, the suspected heroin was sent to the DEA's Western Laboratory for forensic chemical analysis. The results of the chemical analysis confirmed that the substance, which had a net weight of approximately 49.2 grams, contained heroin with an approximate substance purity of 18%, yielding an amount of pure heroin of approximately 8.8 grams.

---

[5] A "zip" is common slang for an ounce.

**November 2, 2017: CS-3 Purchase of Cocaine from MCCOY and LEE's Supplies MCCOY with Drugs for the Transaction**

50.　　　On November 2, 2017, at approximately 1:30 pm, law enforcement investigators established surveillance in the vicinity of MCCOY's residence (**Target Premises #2**) and LEE's residence (**Target Premises #1**) in anticipation of a controlled purchase operation for nine ounces of cocaine between MCCOY and CS-3.

51.　　　At approximately 2:18 pm, surveillance units observed MCCOY exit **Target Premises #2** and enter the front passenger seat of white Hyundai SUV driven by GAMBOA.　The white Hyundai SUV was registered to Laya LIMJOCO[6] at **Target Premises #7**.　Soon thereafter, surveillance units observed the white Hyundai SUV park near a WinCo Foods located at 2400 N. Park Blvd., Pittsburg, California.

52.　　　During the operation, agents met with CS-3 in Pittsburg, California, and CS-3 placed a recorded call to MCCOY:

| | |
|---|---|
| MCCOY: | Hello? |
| CS-3: | What's up wit' you man? |
| MCCOY: | What's up wit' it? |
| CS-3: | We good? |
| MCCOY: | Yeah um, yeah um, if you want to get it, you gotta' give me about an hour and a half, to ah… put it in the water for you, unless you want it all soft. |
| CS-3: | Ain't none of it hard? |
| MCCOY: | No, I mean I do it right when you want it, you know ah.., ah.., I don't want to just do it, ah…, ah… for nothing. You know what I mean? |

---

6 LIMJOCO is believed to be Gamboa's wife.　GAMBOA's Facebook profile reflects that he is married to an individual named "Lala Gamboa."　Law enforcement investigators have compared photographs of Lala Gamboa on Facebook and photographs of LIMJOCO through law enforcement databases, and they appear to be the same person.

| CS-3: | Nah. Ain't, ain't nothing, I..., I..., I'm in motion right now. |
| MCCOY: | Alright, well I, well it will take me about an hour and a half to ah, to whip it, if you want me to do it? |
| CS-3: | Let me call these mother fuckers man and see if I can bring it like that and I'll call you right back. |
| MCCOY: | Yeah, okay. |
| CS-3: | Alright, cuz' I..., I..., I'm ready to go man. |
| MCCOY: | Yeah. |
| CS-3: | I..., I..., I ..., I'll call you, I'll call you right back. |
| MCCOY: | Give me about an hour and a half. Alright. |
| CS-3: | Yeah I'll call you back. |

53.     I believe that in this call CS-3 was discussing with MCCOY obtaining the prearranged nine ounces of cocaine.   CS-3 asked MCCOY if the nine ounces of crack cocaine was ready. MCCOY informed CS-3 that he would need about one and a half hours to "put it in the water" or CS-3 could get the cocaine "soft."  I believe MCCOY was informing CS-3 that he needed to cook the powder cocaine in water to change the substance into crack cocaine for CS-3. MCCOY further informed CS-3 that he needed about one and a half hours to "whip it."   I believe MCCOY was again informing CS-3 that he had to physically stir the soft powder cocaine to create the crack cocaine requested by CS-3.

54.     At approximately 2:42 pm, CS-3 placed another recorded telephone call to MCCOY at TT-1:

| CS-3: | What's up playboy? |
| MCCOY: | [U/I] |
| CS-3: | Man, I...I... need some work. I'll..., I'll take it soft brother. If I can still get it for 750? |
| MCCOY: | Yeah. |
| CS-3: | Okay, I...I'll take it soft. I'll call...I'll call you when I get to the |

| | spot. |
|---|---|
| MCCOY: | Okay, well um, Imma' go grab it for you... [U/I] how long you gon' be? |
| CS-3: | I'm on my way man I'll be...I'll be 10 to 15 minutes man. |
| MCCOY: | Alright, well yeah I...I'll probably be about a half hour or so, so let me go. . .go grab it, and then yeah, just come meet me there. |
| CS-3: | How long you gon' be? Alright. |
| MCCOY: | Imma' make a phone call and go grab it. |
| CS-3: | Alright. |
| MCCOY: | Alright. |
| CS-3: | Alright. |

55.     During this conversation, CS-3 informed MCCOY that he/she would purchase the powdered, or "soft," cocaine instead of the originally agreed upon crack, or "hard," cocaine as long as the price was still $750.00 per ounce.   MCCOY agreed and informed CS-3 that he would "go grab it" after he made a phone call.   I believe that MCCOY planned to call his source of supply and arrange to pick up the powder cocaine for the deal, prior to meeting with CS-3.

56.     Two minutes later, at approximately 2:44 pm, approximately two minutes after CS-3's call with MCCOY at TT-1, MCCOY called LEE (providing further evidence that LEE was MCCOY's source of supply).   Specifically, between 2:44 pm and 3:02 pm, MCCOY and LEE spoke four times on TT-1 and TT-2 with calls ranging from 13 seconds to 1 minute and 17 seconds.

57.     The timing of the calls between MCCOY and LEE indicate that MCCOY planned to obtain the nine ounces of cocaine from LEE prior to MCCOY selling that quantity to CS-3. Indeed, as set forth below, shortly after the phone calls between MCCOY, using TT-1, and LEE, using TT-2, LEE and BROWN met MCCOY in the vicinity of the location where CS-3 had arranged to conduct the cocaine purchase transaction.

58.     Specifically, at approximately 3:05 pm, while monitoring a live feed from a pole-

mounted camera in the vicinity of LEE's residence (**Target Premises #1**), law enforcement investigators observed LEE and BROWN exit LEE's residence.[7]   Subsequently, surveillance units stationed outside **Target Premises #1** observed LEE and BROWN enter a black GMC Yukon and depart from **Target Premises #1**.   At approximately 3:17 pm, surveillance units observed the black GMC Yukon enter the parking lot near the WinCo Foods in close proximity to where MCCOY and GAMBOA had parked the white Hyundai SUV.   Moments later, agents observed MCCOY exit the white Hyundai SUV and enter the black GMC Yukon where LEE and BROWN were sitting.

59.     At approximately 3:19 pm, agents observed MCCOY exit the black GMC Yukon and enter the front passenger side of the white Hyundai SUV driven by GAMBOA.   Soon thereafter, agents observed the white Hyundai SUV drive away from the black GMC Yukon and park next to CS-3's vehicle in the Home Depot parking lot, adjacent to the WinCo Foods parking lot. Surveillance units then observed MCCOY exit the white Hyundai SUV and enter CS-3's vehicle. GAMBOA remained inside the white Hyundai SUV.   Around the same time, surveillance units observed the black GMC Yukon occupied by LEE and BROWN depart the WinCo Foods parking lot.

60.     During the meeting between CS-3 and MCCOY inside CS-3's vehicle, CS-3 gave MCCOY $6,750.00 and MCCOY provided CS-3 with nine ounces of suspected cocaine.   Based on my review of the audio recording of the meeting, MCCOY informed CS-3 that he had some quantity of cocaine left.   Agents were unable to decipher the amount of cocaine MCCOY specified.   MCCOY informed CS-3 that, with his "boy," (apparently referring to his source of supply) it was always good.   MCCOY further stated that the "black" was good as well and he could provide CS-3 with the narcotics at "seven dollars a zip," which I interpreted to mean $700.00 per ounce of heroin ("black").   Moments later, at approximately 3:24 pm, MCCOY

---

[7] As further discussed herein, at the early stages of the investigation, CS-1 notified law enforcement investigators that BROWN was a close associate of LEE who assisted LEE's narcotics trafficking activities and would also sell narcotics on behalf of LEE.

exited CS-3's vehicle, entered the front passenger seat of the white Hyundai SUV, and departed the location with GAMBOA.   MCCOY and GAMBOA returned to **Target Premises #2** after the transaction.

61.     At approximately 3:24 pm, immediately after the transaction concluded, telephone toll records indicate that LEE and MCCOY engaged in a series of telephone communications on TT-1 and TT-2.   Between 3:24 pm and 11:01 pm, the two spoke six times with calls ranging in duration from 2 seconds to 1 minute and 46 seconds.

62.     As was the case with the August 30, 2017 controlled purchase of two ounces of cocaine, the pattern of behavior exhibited by LEE and MCCOY indicates that LEE is MCCOY's source of supply, and that LEE "fronts" drugs to MCCOY by extending them on credit and accepting payment after MCCOY sells the drugs to the ultimate purchaser (in this case, CS-3).   I believe that the purpose of MCCOY's meeting with LEE and BROWN in the black GMC Yukon prior to meeting with CS-3, was to obtain the nine ounces of cocaine requested by CS-3.   The calls between MCCOY (using TT-1) and LEE (using TT-2) immediately after MCCOY sold the nine ounces of cocaine to CS-3, are consistent with this common practice, in that I believe that MCCOY and LEE communicated after the drug transaction to confirm not only the status of the drug deal with CS-3, but where the two should meet so MCCOY could provide LEE with the money provided by CS-3.   The fact that CS-3 had purchased a larger amount of narcotics for a larger amount of money than prior transactions – specifically, nine ounces of cocaine for $6,750.00 – makes it more likely that LEE as the supplier would meet with MCCOY again following the transaction so MCCOY could provide LEE with the money obtained as part of the transaction, minus a portion that MCCOY would have likely earned for conducting the deal.

63.     In addition, I believe that LEE's traveling with BROWN and MCCOY's traveling with GAMBOA is consistent with the targets seeking to enhance their security.   It is common practice for drug dealers to be accompanied by one or more co-conspirators when selling large quantities of narcotics for purposes of security.   Specifically, drug traffickers may feel more susceptible to being robbed when transporting large amounts of narcotics because of the large

amounts of money associated with drugs.

64.     Following the controlled purchase transaction, the suspected cocaine was sent to the DEA's Western Laboratory for forensic chemical analysis.   The results of the chemical analysis confirmed that the substance, which had a net weight of approximately 248.6 grams, contained cocaine hydrochloride with an approximate substance purity of 65%, yielding an amount of pure cocaine hydrochloride of approximately 161.5 grams.

### December 7, 2017: CS-3 Purchase of Heroin from MCCOY

65.     On December 7, 2017, agents directed CS-3 to send a text message to MCCOY at TT-1, in order to ask MCCOY if he could provide CS-3 with two ounces of heroin.   The text message conversation proceeded as follows:

| | |
|---|---|
| CS-3: | What's up lil homie, you think a couple of lil black boys around? |
| MCCOY: | Yup |
| CS-3: | I need two of them. Call you when I get close |
| MCCOY: | AMA be Back in town at six |
| CS-3: | Any. chance for earlier |
| MCCOY: | Outa town |
| CS-3: | K |

66.     Here, CS-3 was asking MCCOY if he/she could buy two ounces of heroin from MCCOY. I understand the term "black boys" to be slang for black tar heroin.   At approximately 5:27 pm, CS-3 placed a recorded telephone call to MCCOY at TT-1, during which CS-3 asked MCCOY for two ounces of heroin, which MCCOY offered to sell for $1,600.00.

67.     At approximately 5:20 pm, agents established surveillance in the vicinity of **Target Premises #2**, MCCOY's residence, as well as the Home Depot, the location of the planned heroin transaction.   At approximately 6:58 pm, agents observed MCCOY's blue Nissan Maxima park next to CS-3's vehicle in the Home Depot parking lot.   Soon thereafter, MCCOY entered CS-3's vehicle where MCCOY gave CS-3 the suspected two ounces of heroin in exchange for

$1,600.00.   MCCOY returned to the blue Nissan Maxima.   MCCOY's vehicle departed the parking lot and returned to the area of **Target Premises #2**.

68.     Following the controlled purchase transaction, the suspected heroin was sent to the DEA's Western Laboratory for forensic chemical analysis.   The results of the chemical analysis confirmed that the substance, which had a net weight of approximately 48.8 grams, contained heroin with an approximate substance purity of 17%, yielding an amount of pure heroin of approximately 8.3 grams.

### January 11, 2018: CS Purchase of Cocaine from MCCOY

69.     On January 10, 2018, at approximately 1:23 pm, CS-3 placed a recorded telephone call to MCCOY at TT-1, during which CS-3 asked MCCOY for two ounces of heroin (using the slang term "black things").   MCCOY informed CS-3 that he was unable to provide CS-3 with any heroin at that time.   Agents directed CS-3 to ask MCCOY about purchasing two ounces of crack cocaine for $1,600.00.   At approximately 2:32 pm, CS-3 and MCCOY spoke on the phone again.   During the conversation, CS-3 asked MCCOY for two ounces of crack cocaine using the slang term "white girls."   MCCOY responded by asking CS-3 if he/she wanted "soft or hard," referring to either powder "soft" cocaine or crack "hard" cocaine.   CS-3 then inquired as to which form is cheaper, to which MCCOY responded "hard."   MCCOY told CS-3 that the price of the cocaine would be "8 dollars still for like ah you know for each," meaning $800.00 per ounce, totaling $1,600.00 for two ounces.

70.     The following day, January 11, 2018, agents met with CS-3 at a neutral location in Pittsburg, California in anticipation of a controlled purchase.   At approximately 1:16 pm, MCCOY and CS-3 spoke to confirm that the transaction was on.   CS-3 and MCCOY confirmed that they would conduct the transaction "at the spot," meaning the same Home Depot located at 2300 N. Park Blvd. from previous transactions.

71.     Prior to the transaction, agents established surveillance at MCCOY's residence (**Target Premises #2**).   At approximately 1:37 pm, agents observed MCCOY and GAMBOA walking

away from MCCOY's residence and enter the same white Hyundai SUV that they had driven to the controlled purchase transaction with CS-3 on November 2, 2017.

72.      At approximately 1:43 pm, agents observed the white Hyundai SUV arrive at the Home Depot parking lot and park next to CS-3's vehicle.   MCCOY exited the white Hyundai SUV and entered CS-3's vehicle.   GAMBOA remained in the driver's seat of the white Hyundai SUV. Once inside CS-3's vehicle, MCCOY gave CS-3 the suspected crack cocaine in exchange for $1,600.00.

73.      During the meeting inside CS-3's vehicle, which was audio-recorded, MCCOY told CS-3 that the suspected cocaine was "fire," referencing the pure quality of the crack cocaine.   I believe that describing narcotics as "fire" alludes to the high experienced after ingesting a narcotic.   MCCOY informed CS-3 that the heroin would be available Saturday if CS-3 still wanted to buy some heroin.   MCCOY then asked CS-3 to inspect the crack cocaine, stating it was "old school fire."   MCCOY informed CS-3 that "his boy" had smoked the crack cocaine and confirmed it was good quality.   MCCOY exited CS-3's vehicle and entered the front passenger seat of the white Hyundai SUV.   The white Hyundai SUV departed the parking lot.

74.      Following the controlled purchase transaction, the suspected crack cocaine was sent to the DEA's Western Laboratory for forensic chemical analysis.   The results of the chemical analysis confirmed that the substance, which had a net weight of approximately 52.3 grams, contained cocaine base with an approximate substance purity of 65%, yielding an amount of pure cocaine base of approximately 33.9 grams.

### April 27, 2018: Controlled Purchase of Crack Cocaine and Related Intercepted Calls Indicating that LEE Supplied Drugs to MCCOY and that GAMBOA assisted MCCOY in the Transaction

75.      CS-3 arranged to purchase nine ounces of crack cocaine from MCCOY by placing a call to MCCOY on April 24, 2018.   During the conversation, which was also intercepted over TT-1, CS-3 requested a "9 pack," referring in code to nine ounces of cocaine.   MCCOY asked CS-3 whether CS-3 wanted "hard or soft," to which CS-3 responded, "the hard."   They set the price at

$6,750 and decided to meet on April 27, 2018, between 12:00 pm and 2:00 pm.

76.     On April, 26, 2018, at approximately 8:09 p.m., the day before the scheduled transaction,
agents intercepted a phone call between MCCOY and LEE over both TT-1 (MCCOY) and TT-2
(LEE).   The following are relevant excerpts from this intercepted phone call:

| | |
|---|---|
| MCCOY: | I got my beaker stuck at a nigga's house and I can't and I can't even use it. And I need to get some from you, you know, and put it in the water, but I was going to ask you if you had an extra beaker for just a day?[8] |
| LEE: | Yeah, I got one for you. |
| MCCOY: | You got no big one though huh? |
| LEE: | Yup. |
| MCCOY: | Do you? I sure need to use it. Um, I need to get me ah, ah, (MCCOY talking to a third party: how much are you gonna' do?) I need to get me ah 9, 10, 11 of the ones you got, and then um tomorrow Imma' get me another ah 9 plus ah, ah a 9 of the ah, of the um, the mash, the mashed potatoes.[9] |
| LEE: | I got you on both cases. |
| MCCOY: | I need 9, ah what, 9, 10, 10, I need ah 11 now and, and, and then tomorrow [U/I] when you get here I'll talk to you, but give me 11 now. Can you bring that, can you bring me that big beaker? |
| LEE: | Yeah listen I am over here by Rio Vista. |
| MCCOY: | Okay. |
| LEE: | Okay, so I'll see you in a little bit. |
| MCCOY: | How long?   About what a hour, 45, 45, 45 minutes? |

---

[8] A beaker can be used to convert powder cocaine into crack cocaine by boiling powder cocaine with sodium bicarbonate (i.e., baking soda).
[9] In the LEE DTO, I believe that "mashed potatoes" is code for crack cocaine.   I base this conclusion on, among other things, this April 27, 2018 transaction, in which CS-3 requested nine ounces of crack cocaine from MCCOY, and then MCCOY requesting "9" of the "mashed potatoes" from LEE.

LEE:          Yeah give me that and I'll be there.

77.    Surveillance, review of pole-mounted camera footage, and tracking of cell phone location monitoring information from TT-2 revealed that LEE went to MCCOY's residence (**Target Premises #2**) on April 26, 2018 (and again on April 27, 2018), in order to consummate the narcotics transactions they had discussed.   Specifically, on April 26, 2018, several minutes after the above-described phone call between MCCOY and LEE, LEE spoke with BROWN over TT-2 two times between 8:12 p.m. and 8:17 p.m. about MCCOY's request for narcotics.   At approximately 8:34 p.m., agents observed a gray Mitsubishi SUV leave the driveway of **Target Premises #1**.   At approximately 8:57 p.m., GPS physical location data for LEE's phone (TT-2) indicated that LEE was in the vicinity of MCCOY's residence (**Target Premises #2**).   At approximately 9:17 p.m., agents in the area of **Target Premises #2** observed the same gray Mitsubishi SUV arrive at **Target Premises #2**.   Soon thereafter, agents observed the gray Mitsubishi return to **Target Premises #1**.   These circumstances indicate that LEE and BROWN delivered the beaker and a quantity of cocaine to MCCOY.

78.    On April 26, 2018, after LEE visited MCCOY's residence and returned to his own residence, another pertinent call was intercepted between LEE (TT-2) and MCCOY (TT-1) at approximately 9:48 p.m., during which they discussed additional cocaine transactions:

LEE:          What's up baby boy?

MCCOY:      Uh, let me get a 9 [U/I] and in the morning I'll get another 9.

LEE:          I can't hear you, huh?

MCCOY:      Let me get a 9 of the mashed potatoes tonight and in the morning I'll get another 9.

LEE:          Okay Jeff let me, let me, take you off, I can't even hear you, this damn thing. Let me take you off of this. Hold on I'm going to call you, this speaker is fucked up. What did you say?

MCCOY:      Let me get the 9 now, tonight, and tomorrow I'll get another 9 of the mashed potatoes.

| LEE: | Jeff, I can't get you that right now. |
| MCCOY: | Tomorrow? |
| LEE: | Yeah, it will be tomorrow for real. |
| MCCOY: | What time [U/I]. |
| LEE: | Oh shit listen, I can, they, they leave for work not probably until 6 or 7 so what time? |
| MCCOY: | It don't matter, I'm trying, I'm trying to get it as soon as I can, [U/I] I don't have nobody else, you know, to get this. |
| LEE: | I'll get up and get it for you first thing in the morning. |
| MCCOY: | Alright. |

79.     On April 27, 2018, at approximately 9:12 a.m., MCCOY used TT-1 to call LEE at TT-2 to confirm the narcotics that LEE previously informed MCCOY he could provide to MCCOY to sell to MCCOY's buyer (CS-3).   The following are relevant excerpts from this intercepted phone call:

| MCCOY: | Yeah I'm just letting you know, just don't forget about me, you know just hold on, just keep, keep that for me. |
| LEE: | Yeah, yeah the 9. |
| MCCOY: | Huh? |
| LEE: | Oh you talking about that the mashed potatoes? |
| MCCOY: | Yeah, yeah, the ah, yeah that too. |
| LEE: | Okay well yeah, you, when do you want the, I'm gonna' go get you the, the, the, the, the, ah apples right now. |
| MCCOY: | Yeah, the mashed potatoes or the apples?[10] |

---

[10] In the Lee DTO, I believe that "apples" is a coded term for cocaine.   I base this conclusion on, among other data points, a February 9, 2019 intercepted call between "JUAN" (a Mexico-based source of supply) and LEE, in which "JUAN" informed LEE that a courier would leave LEE 20 onions and one apple for a third party to pick up from LEE's residence.   Later that day, agents recovered approximately 20 pounds of methamphetamine ("onions") and one kilogram of cocaine ("apples"), which the third party (MARTINEZ-DIAZ) discarded on the side of the road shortly after departing LEE's residence.

LEE:        Well shit I, I got em' both.

MCCOY:      Cause' I gotta', cause the thing is I gotta' sell this, this 9 to this dude by 2 o'clock.

LEE:        Okay, don't, well Jeff listen, when you get ready just, just hit me a little bit about 30 minutes before I got you though, don't worry about it, we locked on both.

MCCOY:      Yeah, but the mashed potatoes are ready for them now, so whenever you get ready just call me to get that, and I'll come up there, or you meet me, or whatever.

LEE:        Okay for the mashed potatoes?

MCCOY:      Yeah, just, just, just let me know about a half hour before, you know, you get em', so I can go get the money.

LEE:        Okay, listen I [U/I] but I gotta', you know me, I gotta' go see, you know, I gotta separate it, put em' in the basket for you.

80.     During this call, LEE was informing MCCOY that LEE had the nine ounces of cocaine MCCOY intended to sell to CS-3 later that afternoon.   LEE also informed MCCOY that LEE could provide an additional supply of cocaine ("apples") to MCCOY after the drug transaction with CS-3 took place.   At approximately 12:14 p.m., LEE used TT-2 to call MCCOY at TT-1. During this intercepted conversation, LEE informed MCCOY that LEE did not have the amount of narcotics MCCOY requested, but would still provide MCCOY with a portion of the requested narcotics:

LEE:        Hey there's 12 left Jeff you want em'?

MCCOY:      Just 12?

LEE:        Yeah.   I, I, I, I, sold more than I thought I did, so.

MCCOY:      I thought you had a half.

LEE:        Yeah, I did too.   Looked like it, but it sure ain't.

MCCOY:      Yeah, but I'll [U/I] get it, can you, can you bring em' to me now then?

| | | |
|---|---|---|
| LEE: | Yeah, I'm gonna' bring em' right now. | |
| MCCOY: | Ah damn, that's all, that's all it is? | |
| LEE: | Right now.   But he, I talked to him today he said there would be some more. | |
| MCCOY: | By when, it, it took a month. | |
| LEE: | Yeah I don't know Jeff, but he told me that as soon as I got rid of that, that he would send some more. | |
| MCCOY: | Last time it took like three damn weeks. | |
| LEE: | Oh yeah, that ain't like the apples. | |
| MCCOY: | Yeah, alright, yeah well cause', yeah if that's all you got then I, I'll take it all. | |
| LEE: | Okay, I'm gonna' bring it right now. | |

81.     At approximately 12:32 p.m., LEE and BROWN drove to MCCOY's residence (**Target Premises #2**), in a light-colored SUV.   Agents noted LEE's movements through video footage from a pole-mounted camera in the vicinity of **Target Premises #2**, cell phone location data for LEE's phone (TT-2), and physical surveillance during which agents identified LEE as the driver of the light-colored SUV and BROWN as the passenger.

82.     At approximately 12:46 p.m., agents directed CS-3 to contact MCCOY on TT-1 and arrange to conduct the controlled purchase transaction with MCCOY at the Home Depot located at 2300 N. Park Blvd.   During the phone call, MCCOY informed CS-3 that MCCOY had the narcotics that CS-3 had requested.   Shortly thereafter, at approximately 12:51 p.m., MCCOY used TT-1 to call GAMBOA at 415-619-9770.   During this intercepted telephone conversation, MCCOY informed GAMBOA that the "dude" was "up the street" and told GAMBOA that he had to "come right now."   Shortly after this call, agents observed GAMBOA, driving a white Hyundai SUV, arrive at MCCOY's residence to pick up MCCOY and drive to the Home Depot parking lot.   MCCOY exited the front passenger seat of the white SUV and entered the front passenger side of CS-3's vehicle.   Once inside CS-3's vehicle, MCCOY sold CS-3 the

suspected crack cocaine in exchange for $6,750.00.

83.     During the meeting inside CS-3's vehicle, which was audio-recorded, MCCOY told CS-3 that MCCOY meant to bring CS-3 a "couple gram" sample of "black" (heroin) for free that was "super, super, strong," "all raw from the brick," "fire," and "so potent it would put your dick in the dirt."

84.     Following the controlled purchase transaction, the suspected crack cocaine was sent to the DEA's Western Laboratory for forensic chemical analysis.   The results of the chemical analysis confirmed that the substance, which had a net weight of approximately 256.4 grams, contained cocaine base with an approximate substance purity of 50%, yielding an amount of pure cocaine base of approximately 128.2 grams.

### Additional Intercepted Calls Between LEE and Anthony BROWN, aka "Ant Man," Indicating that BROWN is Assisting LEE, Including Assisting him in the Above-Described April 26-27, 2019 Transaction Involving Nine Ounces of Crack Cocaine

85.     On April 26, 2018, two minutes after the phone call described above, between MCCOY and LEE, during which MCCOY asked LEE to bring him "11" (referring to 11 ounces of crack cocaine) and a beaker, LEE spoke with Anthony BROWN over TT-2 twice about MCCOY's request for narcotics.   The following are relevant excerpts from the phone call at approximately 8:12 p.m., on April 26, 2018, between LEE using TT-2 and BROWN using (925) 238-5918:

LEE:         Ant Man?

BROWN:      Yes sir?

LEE:         How many apples we got there? We need, I need 11.

BROWN:      11, I think I got 11, let me call you right back, let me go check, let me call you right back.

LEE:         Alright.

BROWN:      Let me call you right back.

LEE:         Alright.

86.     The following are relevant excerpts from the phone call at approximately 8:17 p.m., on

April 26, 2018 between LEE using TT-2 and BROWN using (925) 238-5918:

| | |
|---|---|
| BROWN: | Hello. |
| LEE: | What's up baby boy? |
| BROWN: | Yeah, yeah, we good. |
| LEE: | Got 11? |
| BROWN: | Yes sir. |
| LEE: | Okay [U/I] you ain't have no car, I'm on my way. Listen look under there, you know the big beaker I got? |
| BROWN: | Yeah. |
| LEE: | The big one, get it? |
| BROWN: | Okay. |
| LEE: | Put 11 in it and then I'm gonna' come pick you up, jump your ass in the car. No you stay there, just, just come out to the car. |
| BROWN: | Yeah [U/I] you're losing me right now. |
| LEE: | Huh? |
| BROWN: | Okay. |
| LEE: | Listen, just grab the 11… |
| BROWN: | And meet you outside. |
| LEE: | Yeah, and the jar, and the big, the big beaker I'm gonna' go [U/I]. |
| BROWN: | Okay cool, no problem. |
| LEE: | Okay yeah, yeah, [U/I] just meet me outside Imma', I'm coming back to Antioch right now. I'll be there in about 15 minutes. |
| BROWN: | Okay, I'm in the garage waiting for you. |

87.     Based on a review of interceptions as well as other pertinent interceptions on April 26 and April 27, 2018, agents believe that LEE was asking BROWN to obtain 11 ounces of cocaine as well as LEE's "big beaker" that MCCOY had requested from LEE moments prior to LEE communicating with BROWN, so that LEE could deliver them both to MCCOY.   Based on the

facts set forth above, agents further believe that BROWN did in fact deliver the crack cocaine

and beaker to LEE, which LEE then delivered to MCCOY.

### Additional Intercepted Calls Between MCCOY and Deshawnte GAMBOA Demonstrating GAMBOA's Assistance to MCCOY's Drug Distribution Activities

88.     As set forth above, GAMBOA assisted MCCOY during the controlled purchase

transaction with CS-3 on November 2, 2017, January 11, 2018, and April 27, 2018, buy driving

MCCOY to the transactions.   GAMBOA's intercepted phone calls with MCCOY also indicate

that he sells narcotics on behalf of MCCOY, and that MCCOY used GAMBOA's residence,

**Target Premises #7** as a stash house to store drugs.

89.     For instance, on May 6, 2018, at approximately 8:42 p.m., agents intercepted a phone call

between MCCOY and GAMBOA over TT-1, during which GAMBOA asked MCCOY about

whether MCCOY could source narcotics to a female third party.   GAMBOA stated to MCCOY,

"You don't wanna' sell a whole zip (ounce) for 1200 do you?"   MCCOY responded that

MCCOY had "two left" and he would sell them.   GAMBOA said the female interested in

purchasing the suspected narcotics had contacted GAMBOA approximately 15 minutes earlier

and told GAMBOA that she wanted to buy a "zip."   MCCOY informed GAMBOA that he

would provide the narcotics to GAMBOA to sell to the female.

90.     In addition, during the wiretap, GAMBOA warned MCCOY frequently about police

activity in the area of MCCOY's residence (**Target Premises #2**).   For instance, on April 24,

2018, agents intercepted a phone call between MCCOY and GAMBOA over TT-1 during which

MCCOY said to GAMBOA, "there's hella cops out here," and GAMBOA responded, "I was

calling, I was about to tell you."   Similarly, on April 25, 2018, agents intercepted a phone call

between MCCOY and GAMBOA over TT-1 during which GAMBOA informed MCCOY that

the police were driving in the direction of MCCOY's residence and instructed MCCOY to "hurry

up, pick your shit up."   These calls further indicate GAMBOA's participation in MCCOY's

drug distribution enterprise.

91.    Furthermore, a series of intercepted calls on August 23, 2018 indicate that MCCOY used GAMBOA's residence, **Target Premises #7**, as a stash house for drugs that MCCOY intended to distribute to others in connection with the DTO.   The August 23, 2018 calls were intercepted between MCCOY at TT-1, GAMBOA utilizing (415) 619-9770, and an unidentified male (UM8643) utilizing (925) 595-8643.

92.    At approximately 3:36 p.m., UM8643 using (925) 595-8643 called MCCOY at TT-1 asking MCCOY if he could "get a ball real quick," using a slang term "ball" or "8 ball" for 1/8 ounce of cocaine.   MCCOY confirmed and told UM8643 that he would "be out there in about 30 minutes when I get off work."   At approximately 6:18 p.m., UM8643 (using (925) 595-8643) called MCCOY at TT-1, telling MCCOY, "I'm fittin to be pulling up."   MCCOY responded by saying, "Shit I gotta' go get the ball for you.   Shit just give me a minute bro, I gotta' go grab it, shit."

93.    Approximately 22 minutes later, at 6:40 p.m., MCCOY at TT-1 called GAMBOA at (415) 619-9770.   The following is a relevant portion of the conversation:

MCCOY:    Hey you at home?

GAMBOA:    Yeah.

MCCOY:    Ah, I'm gonna' pay my cell phone bill, and ah I'll be by there, I gotta grab something for somebody. I'll be there.

94.    I believe that UM8643 is a customer of MCCOY's and was asking MCCOY if he could purchase suspected narcotics.   Shortly after, MCCOY contacted GAMBOA asking if GAMBOA was home and telling GAMBOA that "I gotta grab something for somebody."   Based on the sequence of calls, I believe that MCCOY was asking GAMBOA if GAMBOA was home in order to obtain the suspected narcotics being stored at GAMBOA's residence.

95.    At approximately 7:09 p.m., MCCOY at TT-1 contacted GAMBOA at (415) 619-9770. During the call, MCCOY told GAMBOA, "I'm at your house. You in the house or what?" GAMBOA then told MCCOY that he was "right around the corner."   In a later call, MCCOY asked where GAMBOA was; GAMBOA responded by saying "Man, I'm about to turn onto

Parkside.   My wife said the door is open nigga."   Based on my knowledge of the investigation,

N. Parkside Dr., Pittsburg, California, is an access road to reach **Target Premises #7**.

96.     A few minutes later agents intercepted another conversation between MCCOY and

GAMBOA:

| | |
|---|---|
| MCCOY: | Yeah where the gloves, the blue gloves? |
| GAMBOA: | You said where the gloves? |
| MCCOY: | And those gloves and baggies? |
| GAMBOA: | I got the gloves and shit upstairs, I'm coming in the gate. |

97.     I believe that MCCOY was asking GAMBOA about the "gloves and baggies" because

MCCOY planned to package the suspected narcotics before providing them to UM8643.   It is

common practice for drug traffickers to maintain gloves and baggies at the locations where they

prepare narcotics for sale.   I believe that drug dealers typically wear gloves when packaging

narcotics, because some narcotics can be absorbed by touch.   Additionally, I know that is

common for drug dealers to use small plastic sandwich and snack bags to separate narcotics into

gram and ounce size quantities for distribution to customers.   Furthermore, I believe that

GAMBOA maintaining "gloves and baggies" at his indicates that GAMBOA and/or MCCOY

likely package and distribute narcotics from **Target Premises #7**.

## Intercepted Calls Demonstrating that Jose Ramon DELGADILLO, aka "Tepa" DELGADILLO, is a Drug Source for LEE

98.     Jose Ramon DELGADILLO, aka "Tepa," is the user of TT-4, which is subscribed in

DELGADILLO's name at 2320 Peach Tree Drive, Apt. 40, Fairfield, California 94533.

DELGADILLO is believed to live at the same address, but at Apartment 44, not Apartment 40.[11]

This section provides examples of intercepted calls which show that DELGADILLO has

supplied drugs to LEE and that DELGADILLO uses Marco DELGADILLO (DELGADILLO'S

brother) to move money and narcotics.   For example, on August 1, 2018, agents intercepted a

---

[11] DELGADILLO's residence is located in the Eastern District of California.   I have submitted a request for a
search warrant for that premises to a magistrate in that district.

call between DELGADILLO using TT-4 and LEE using TT-3, in which they discuss the price of cocaine that DELGADILLO intended to sell to LEE:

| | |
|---|---|
| DELGADILLO: | Yeah, but it's going to be like 26, 25 and a ½ probably.[12] |
| LEE: | Okay, that's what I'm saying, 25 and a ½ sounds good man.   I'm waiting on you Tepe call me.   I got 2 or 3 [U/I] man, for real. |
| DELGADILLO: | Yeah the agents know.   So. |
| LEE: | 25 and a ½ I promise you I'll give you…   I listen, those mother fuckers will be gone in a day. |
| DELGADILLO: | Okay so…   [U/I] if I tell them 25 and a 1/2, just give me something. |
| LEE: | Okay Juan will take care of you.   I'll take care of you don't worry about it Tepe. |
| DELGADILLO: | It's okay so. |
| LEE: | Okay. |
| DELGADILLO: | Uh so on Saturday or Friday. |
| LEE: | [U/I] |
| DELGADILLO: | I got the, I got the ½ of the ¼ that I already tell you. |
| LEE: | Yeah. |
| DELGADILLO: | And you can look at it first if you want.   Come tomorrow and take a pick and try it. |
| LEE: | I'll, I'll come and look at it. |

99.   Also, on August 1, 2018, at approximately 2:46 p.m., LEE using TT-3 contacted DELGADILLO over TT-4 and they discussed an apparent difficulty in obtaining suspected narcotics.   DELGADILLO also told LEE he would try to negotiate a better price with the drug source:

---

[12] Referring to $26,000 and $25,500 which are consistent with the price per kilogram of cocaine.

| | |
|---|---|
| LEE: | Yeah just listen, I just had, I just went through 3, I had 5 of them already gone.   So now a motherfucker done call, one come got 2, he want, he want 2 more.   And I got another one that want them. So you know I go through it, but goddamn I got get it, shit. |
| DELGADILLO: | Yeah and how is for uh, for Juan? |
| LEE: | Oh shit it was, it was good for a fucking minute, but now it's nothing.   Shit [U/I] He can't keep up either.   You know what I mean.   So it's bad around here, nobody can fucking keep up. Shit. |
| DELGADILLO: | Yeah. |
| LEE: | Yeah. |
| DELGADILLO: | I'm going to talk to these guys to see if they have more, and um, and start fighting with them that they lower their price and get back to you. |

100.    As set forth in more detail below, the individual who DELGADILLO refers to as "Juan" is believed to be a common Mexico-based source of supply for both LEE and DELGADILLO.

### May 15, 2018: Seizure of Approximately Four Kilograms of Heroin Mixed with Fentanyl and $46,000 from Courier Jesse LOPEZ III

101.    On May 15, 2018, the DEA Oakland RO and Antioch Police Department, with assistance from the Fairfield Police Department, conducted a surveillance operation focused on LEE's residence (**Target Premises #1**) and DELGADILLO's residence in Fairfield, California.   The operation ultimately resulted in a seizure of approximately $46,000.00 and four kilograms of heroin mixed with fentanyl from inside a vehicle driven by Jesse Lopez III, a suspected courier for the DTO.   Two cellular telephones were seized from LOPEZ in connection with his arrest, and state law enforcement officers obtained a California state search warrant to search the data

within the devices.[13]

102.    A review of the information obtained from the search of LOPEZ's telephone revealed that on May 13, 2018, at approximately 7:15 p.m., LOPEZ placed a call to DELGADILLO at TT-4.   On May 14, 2018, at approximately 7:41 a.m., LOPEZ made a call to DELGADILLO lasting approximately 22 seconds.   At approximately 7:42 a.m., LOPEZ's telephone received a text message from DELGADILLO stating "2320 peach tree dr Fairfield.ca" (DELGADILLO's address).   At approximately 10:34 a.m., LOPEZ sent a text message to DELGADILLO stating "10 mins."   I believe that DELGADILLO was providing LOPEZ with DELGADILLO's address for LOPEZ to meet with DELGADILLO on the morning of May 14, 2018.

103.    On the morning of May 15, 2018, starting at about 9:51 am, LOPEZ exchanged multiple calls and texts with LEE using TT-3.   This included a text message from LEE to LOPEZ at approximately 10:14 a.m., in which LEE sent LOPEZ his (LEE's) address: "4608 Nopah" **(Target Premises #1)**.   LOPEZ responded at approximately 11:10 am, stating "10 min."

104.    At approximately 11:23 am, agents observed via pole-mounted camera footage that LOPEZ arrived at LEE's residence in a grey sedan.   At the same time, LEE called BROWN at telephone number 925-238-5918.   At the time of the call, BROWN was at LEE's residence **(Target Premises #1)** standing in LEE's driveway speaking with Lopez.   During the intercepted call, LEE informed BROWN he was picking up the "tickets"[14] and instructed BROWN to inform LOPEZ that LEE would return to **Target Premises #1** shortly.

105.    At approximately 11:28 a.m., agents intercepted a phone call between LEE and POLK over TT-2.   During the intercepted conversation, LEE asked POLK if she was home, and POLK confirmed she was.   At approximately 11:34 a.m., GPS location monitoring of the black Nissan truck, believed to be driven by LEE, indicated that the vehicle was located at Deborah POLK's

---

[13]  On May 15, 2018, Judge Alesia Jones of the Solano County Superior Court authorized a search warrant for the two wireless telephones seized from LOPEZ.

[14]  In the Lee DTO, I believe that "tickets" is a coded term for U.S. currency.   I base this conclusion on, among other things, a seizure of $76,200 in cash from a DTO courier that occurred on August 6, 2018.   After the seizure, agents intercepted a call between LEE and "JUAN" at +52-653-102-3976 during which "JUAN" informed LEE he believed that the courier "had just the tickets" when he was stopped by the police.

residence at 3412 Serpentine Drive, Antioch, California (**Target Premises #6**).

106.    At approximately 11:35 a.m., LEE called BROWN again.   During the intercepted phone call, LEE instructed BROWN to "look in the drawer underneath the TV and see how much in there," to which BROWN responded, "looks like you got 4 buddy."   Based on the forgoing, I believe that LEE went to POLK's residence and, while he was there, called BROWN, in order to ascertain how much money LEE already had at his residence.   I believe that the "4" that BROWN told LEE that LEE had was in reference to $4,000.00 in drug proceeds.   I believe that LOPEZ was delivering an unspecified narcotic to LEE's residence and that LEE went to POLK's residence to pick up bulk cash to complete the transaction.

107.    At approximately 11:53 a.m., agents observed LEE return to **Target Premises #1**, where LOPEZ and BROWN were still present inside LEE's garage.   Agents observed LEE carry a plastic bag from the Nissan truck into the open garage.   Agents observed LEE and LOPEZ look inside the plastic bag prior to LOPEZ taking the bag and putting it into the trunk of the grey sedan that LOPEZ had driven to **Target Premises #1**.   Agents then observed LOPEZ remove a dark-colored bag with a Nike swoosh on it from the trunk of the grey sedan and walk into LEE's garage.   Shortly thereafter, LOPEZ was observed exiting the garage with the same Nike bag, and placing the bag in the rear driver's side of the grey vehicle.

108.    At approximately 11:59 a.m., agents observed LOPEZ enter the grey vehicle and depart the area.   Agents maintained surveillance on the grey vehicle, which agents observed to be a Kia Optima, bearing California license plate 7YFZ909, registered to LOPEZ.   Agents maintained surveillance on the Kia Optima as it headed in the direction of DELGADILLO's apartment complex in Fairfield, California.

109.    At approximately 12:45 p.m., agents observed the Kia Optima park in the area of DELGADILLO's apartment complex.   Moments later, utilizing a covert video recording device, agents observed and recorded DELGADILLO and his brother Marco DELGADILLO, meet with LOPEZ near the Kia Optima.   More specifically, while LOPEZ was speaking with both DELGADILLO and Marco DELGADILLO outside the Kia Optima, LOPEZ opened the rear

driver-side door of the vehicle, revealing the area where investigators later found, during a traffic stop, a bag containing four kilograms of heroin mixed with fentanyl.  (During the traffic stop, the bag was found on the folded-down backseat directly behind the driver's seat.)

110.    After Marco DELGADILLO departed the area, and as LOPEZ and DELGADILLO continued to converse outside the Kia Optima, agents observed DELGADILLO use a cellular telephone to make or receive two phone calls.  Toll records for DELGADILLO's phone (TT-4) around the time of this meeting show that at approximately 12:52 p.m., TT-4 placed a call to a Mexico-subscribed telephone number (+52-653-174-6579) lasting approximately 9 seconds, and received a call back from the same number at 12:52 p.m., lasting 1 minute and 10 seconds. After DELGADILLO completed his second phone call, LOPEZ departed the vicinity of the apartment complex in the grey Kia Optima at approximately 12:56 p.m.

111.    As noted earlier, at approximately 1:07 p.m., Fairfield Police Officers conducted a traffic stop on the Kia Optima.   In connection with the stop, officers seized the plastic bag that agents had observed LEE take out of the black Nissan truck and show LOPEZ inside the garage of LEE's residence earlier in the day.   The bag contained approximately $42,900.00, and LOPEZ had several thousand dollars on his person.   The dark-colored bag with a Nike swoosh that LOPEZ had carried into LEE's garage and then taken back out and put in the Kia Optima contained four packages, each weighing approximately one kilogram, consisting of heroin mixed with fentanyl.[15]   Agents believe that both of these bags remained in the Kia Optima from the time LOPEZ left LEE's residence (**Target Premises #1**) and drove up to DELGADILLO's apartment complex.

112.    Later the same day, about three and a half hours after the seizure, at approximately 4:38 p.m., LEE received a call over TT-2 from an unidentified male at telephone number 925-204-8195, whom LEE addressed as "JIBON" (phonetic).   During the conversation, agents believe

---

[15] Investigators initially suspected that the seized packages contained cocaine based on a field test, among other things.  However, on June 14, 2018, the DEA's Western Laboratory confirmed that the seized packages contained substances consisting of heroin mixed with fentanyl.

that LEE was utilizing a second telephone to simultaneously speak with an individual LEE identified as "JUAN." After LEE answered the phone call from "JIBON" over TT-2, agents could hear him speaking with another individual in the background that LEE addressed as "JUAN." Agents could only hear LEE's side of the conversation:

> **LEE:** Yeah, hell yeah Juan. [U/I] makes me right now, I'm fitting to go to make sure everything is okay, you know what I mean...And that's what he said when he was leaving, he said that he was gonna' go get a room because it was hella' hot and I don't mean if that's what he did, but he did say he had to go talk to Tepa. Yeah. Okay Juan, call me back because I don't want to call the number, you know. Oh fuck, he got my, he got my address in there too, shit. Okay there Juan. Alright.

113. Based on LEE's statements during this call and the other events of May 15, 2018 described above, I believe that LEE and "JUAN" discussed the traffic stop of LOPEZ and the seizure of narcotics and money from LOPEZ's vehicle. I believe that when LEE informed "JUAN," "that's what he said when he was leaving," and "he did say he had to go talk to Tepa," that LEE was explaining to "JUAN" that LOPEZ left LEE's residence and went to DELGADILLO's residence to speak with DELGADILLO. In addition, I believe that when LEE said, "he got my address in there too," he was referring to the text message that LOPEZ received from phone number 925-238-5308 earlier in the day at approximately 10:14 a.m. that stated "4608 Nopah."

114. Based on the information obtained on May 15, 2018, I believe that LOPEZ was acting as a narcotics courier for the DTO, transporting narcotics on behalf of DELGADILLO, LEE, and "JUAN."

### August 2, 2018: Intercepted Calls and Surveillance Indicating that Mexico-Based Source ("JUAN") and LEE Arranged a Drug Delivery in which Mago AGUILAR-Pacheco Served as a Courier

115. During the second period of wire interceptions, agents intercepted calls between LEE and

"JUAN" and LEE and AGUILAR.   Specifically, in a series of calls intercepted over TT-3 between LEE and "JUAN" on August 2, 2018, "JUAN" informed LEE that a courier would be coming to his residence.   At approximately 8:59 a.m., "JUAN" called LEE to discuss the prospective suspected narcotics transaction:

| "JUAN": | Oh, okay.   Yeah, okay, okay, ah, ah, just put it in there, then, then, then, then, ah, then, ah tell them to check the papers before they, before they, they, they, leaving you. |
|---|---|
| LEE: | Okay, no problem Juan, listen I'll call you if they don't speak this English, you can tell them. |
| "JUAN": | Yeah, okay.   The [U/I] um, they have 3 mashed potatoes.   Um, they have them like a, like a, brown, like a brown tape with a, with a three X on the, on the, on top. |
| LEE: | Okay, and it's 2? |
| "JUAN": | Yeah. |
| LEE: | Okay, I'll call the guy and let him know 2 Juan. |
| "JUAN": | Yeah, okay sounds good. |
| LEE: | Okay, I, I'll call you as soon as I hear, or you give him my number, I'll call you as soon as they get here, so we can check the tickets. |

116.   Later the same day, agents intercepted several additional calls between "JUAN" and LEE over TT-3 during which they continued to discuss the logistics and specifics of the prospective suspected narcotics transaction.   Eventually, at approximately 4:33 p.m., agents intercepted a call to LEE at TT-3 from AGUILAR, who was using phone number (626) 734-2053.   The following is a relevant excerpt from this call:

| AGUILAR: | Lorenzo? |
|---|---|
| LEE: | Yeah? |
| AGUILAR: | It's me Mago. |
| LEE: | How you doing? |

(Temporary cell reception issues during call)

AGUILAR:        Give me your address.

LEE:            Okay, you want me to text it to you?

AGUILAR:        Yeah.

LEE:            Okay, I'mma' text you right now.

AGUILAR:        Okay, I'm 20 minutes.

LEE:            Okay, I'll text you right now.

117.    Telephone toll records for TT-3 reflect that at approximately 4:37 p.m., LEE sent a text message to (626) 734-2053.   Based on the content of the intercepted call and the toll record of the text message shortly after the call, I believe that LEE sent AGUILAR a text message containing his home address (**Target Premises #1**).

118.    Agents established surveillance in the vicinity of LEE's residence at approximately 3:29 p.m. on August 2, 2018.   Approximately thirty minutes after AGUILAR called LEE at TT-3, agents saw, through a combination of in-person and aerial surveillance, as well as monitoring a pole-mounted camera, a white GMC Sierra park across the street from LEE's residence (**Target Premises #1**).   Agents then saw AGUILAR exit the vehicle and walk to the bed of the truck. Moments later, agents saw AGUILAR remove a bag from the bed of the truck and walk across the street towards **Target Premises #1**.   AGUILAR entered the garage with the bag.   Soon thereafter, AGUILAR met with LEE in the garage and then entered **Target Premises #1**.

119.    Agents then saw AGUILAR, who was holding a bag, exit LEE's garage and walk across the street towards the white GMC Sierra.   Agents saw AGUILAR place the bag into the bed of the truck and then drive away from **Target Premises #1**.

120.    Agents later located the white GMC Sierra parked in the vicinity of an apartment complex located at 19826 San Miguel Ave., Castro Valley, California.   Soon thereafter, the white GMC Sierra departed the vicinity of the apartment complex.   Officers with the Alameda County Sheriff's Department conducted a traffic stop.   During the stop, officers obtained the driver's license of the driver.   The license showed that the driver was Mago AGUILAR-

Pacheco, with an address of 3535 Folsom Street, Los Angeles, California.   Agents confirmed

that the registered owner of the white GMC Sierra, with license plate 33487H2, is Mago

AGUILAR-Pacheco at 1409 East Larkwood Street, West Covina, California.

121.     Law enforcement did not search AGUILAR's vehicle on August 2, 2018.   However,

there is additional evidence that AGUILAR is a courier acting as a source of supply for LEE.

As set forth below, AGUILAR was arrested on January 26, 2019 in possession of two kilograms

of cocaine that intercepted communications indicate AGUILAR was to deliver to LEE.

### August 8, 2018: Seizure of 18 Pounds of Methamphetamine Being Delivered to Luis Angel TORRES-GARCIA, aka "Guero," by DELGADILLO's Brother Marco DELGADILLO on Behalf of DELGADILLO

122.     Agents intercepted several calls over TT-4 between DELGADILLO and his brother

Marco DELGADILLO that ultimately led to the seizure of 18 pounds of methamphetamine from

a vehicle driven by Marco DELGADILLO on August 8, 2018.   The intercepted calls show that

the drugs were to be delivered to Luis Angel TORRES-Garcia, aka "Guero."

123.     In the following August 8, 2018, call, which was intercepted over TT-4, DELGADILLO

committed to delivering drugs to TORRES-GARCIA.   The call took place at approximately

12:29 p.m.:

| | |
|---|---|
| DELGADILLO: | What's up?   I'm here just waiting for him to come… from down there and bring you that. |
| TORRES-GARCIA: | Uh.   But that old man needed some, I don't have anything.   You help him out. |
| DELGADILLO: | OK.   Well, yeah, either way.   Do you want me to bring you that first? |
| TORRES-GARCIA: | Yeah, of course. |
| DELGADILLO: | OK.   So… No, but the thing is they're coming right now.   As soon as they come I'll head over there. |

> TORRES-GARCIA: Fucking great.
>
> DELGADILLO:    Uh, I'll have it there in about an hour.

124.   Approximately eleven minutes later, at 12:40 pm, DELGADILLO called Marco

DELGADILLO at 707-515-8606 and confirmed he would be able to deliver the drugs to

TORRES-GARCIA.   The following are relevant excerpts from this intercepted conversation:

> DELGADILLO:    Oh, OK.  Will you guys be able to go over there or not?
>
> MARCO:    Yea, I'll go.
>
> DELGADILLO:    Oh, OK.
>
> MARCO:    Well, yeah, then, talk to him, if he wants me to go Friday, I'll go
>
> on Friday.  Not to miss work or anything like that.
>
> DELGADILLO:    No, I... I've already [U/I] now to the dude and he doesn't have
>
> anything.
>
> MARCO:    Uh, yeah.  I'll head out right away once I get off work.
>
> DELGADILLO:    [U/I] Oh, so... when you guys get off come over here, dude.
>
> MARCO:    Yeah.

125.   Later the same day, at approximately 3:30 p.m., DELGADILLO received a call from

Marco DELGADILLO, in which Marco DELGADILLO confirmed he would complete the drug

delivery:

> DELGADILLO:    ...all of it ready to go, right away.
>
> MARCO:    Yeah, I'll get there and leave.  I'll be gone just like that.
>
> DELGADILLO:    Oh, OK.
>
> MARCO:    Yeah.
>
> DELGADILLO:    All right, then, dude.
>
> MARCO:    Did you call the guy yet?
>
> DELGADILLO:    I'll tell him now.  Yeah I already told him, but he was waiting for
>
> a hard one too, but this guy doesn't have anything like that.  It's
>
> not like I can leave like that.  Once you make another trip to make

some more money.

126.    Approximately nine minutes later, at 3:39 p.m., DELGADILLO called TORRES-
GARCIA at 707-726-3102.   DELGADILLO confirmed that "my brother" (Marco
DELGADILLO) would deliver the drugs:

| | |
|---|---|
| DELGADILLO: | What's up dude?   Look.   I'm going to send my brother right now with…with those.   Because the…the…Those guys will take two more hours, those dudes. |
| TORRES-GARCIA: | They won't make it I told you. |
| DELGADILLO: | No, yes, yes, they will make it dude. |
| TORRES-GARCIA: | Yes, I know.   But I told you that we were just wasting time. |
| DELGADILLO: | Sure.   No, my brother is…is…is is preparing another one, and then he'll take off. |
| TORRES-GARCIA: | Good, and anyways, for…for…for those over there we're not in a big hurry right now.   Because I'm telling you, they have some left over. |
| DELGADILLO: | Yes. |
| TORRES-GARCIA: | But the other ones, fucking bring me all of them right now. |
| DELGADILLO: | All of them at once? |
| TORRES-GARCIA: | At…at once, dude. |
| DELGADILLO: | OK.   Because I'm… I'm sending you 12. |
| TORRES-GARCIA: | Send more. |
| DELGADILLO: | More?   OK.   Let me put in another one. |

127.    Shortly thereafter, at approximately 3:44 pm, DELGADILLO called TORRES-GARCIA.
DELGADILLO confirmed that 18 pounds of drugs would be delivered.   The following are
relevant excerpts from this intercepted conversation:

| | |
|---|---|
| DELGADILLO: | Well, I'll…I'll send you 18. |
| TORRES-GARCIA: | 18? |

| DELGADILLO: | Uh-huh. |
|---|---|
| TORRES-GARCIA: | [U/I] And how much do you think we should give to the [U/I] to the dude? |
| DELGADILLO: | About, mm, how much do you think?   Around...? |
| TORRES-GARCIA: | I'll pay for...I'll pay him for the...I'll pay for the...the transportation. |

128.    Based on a review of these intercepted communications, agents established surveillance in the vicinity of DELGADILLO's residential apartment complex in Fairfield, California, on August 8, 2018.   (Marco DELGADILLO lives in the apartment complex across from DEGLADILLO's apartment complex.)   At approximately 4:00 p.m., agents observed Marco DELGADILLO and DELGADILLO place a large black duffel bag in the rear of Marco DELGADILLO's vehicle.   After Marco DELGADILLO departed the parking lot of the complex, agents conducted mobile surveillance on Marco DELGADILLO's vehicle, which was headed north in the direction of Rio Del, California, where TORRES-GARCIA is believed to reside at **Target Premises #9**.   The Sonoma County Sheriff's Office eventually conducted a traffic stop of the vehicle and, during the stop, seized the large black duffel bag that was found to contain approximately 18 pounds of methamphetamine.   The substance was sent to the DEA Western Regional Laboratory and tested positive for methamphetamine.

### Additional Intercepted Calls Indicating the Ongoing Involvement of TORRES-GARCIA and DELGADILLO in the DTO Conspiracy

129.    On February 7, 2019, a series of conversations were intercepted between DELGADILLO (using TT-4), TORRES-GARCIA (using (707) 273-0908 and (707) 726-3741), and Carlos GONGORA (using (707) 816-9419).   The conversations showed that DELGADILLO was arranging for GONGORA to obtain suspected drug proceeds from TORRES-GARCIA, indicating that DELGADILLO was continuing to act as a source of supply for TORRES-GARCIA with significant quantities of narcotics on credit.

46

130.   At approximately 11:12 a.m. agents intercepted a conversation between DELGADILLO at TT-4 and TORRES-GARCIA at (707) 726-3741, during which TORRES-GARCIA and DELGADILLO agreed that TORRES-GARCIA would meet a third party in Windsor, California.

131.   During the call, DELGADILLO explained that GONGORA would be meeting TORRES-GARCIA in Windsor, California, to pick up approximately $14,500 worth of proceeds.   In a later conversation, GONGORA asked DELGADILLO, "Do I, do I need to count that or do you believe him?"   DELGADILLO told GONGORA, "No, I believe him dude.   He always brings me everything."   DELGADILLO then told GONGORA, "No, no that guy gives it to you all with tape and everything."

132.   The apparent confidence that DELGADILLO expressed in TORRES-GARCIA providing the correct amount of money indicates that TORRES-GARCIA is a frequent customer of DELGADILLO's.   Also, DELGADILLO's statement to GONGORA that TORRES-GARCIA will "gives it to you all with tape and everything" bolsters agents' belief that TORRES-GARCIA would be providing GONGORA with drug proceeds.   Based on my training and experience, it is common practice for narcotics traffickers to wrap large sums of money in tape for several reasons: maintain count accuracy; mitigate the odor of any narcotics that may have touched the money; and condense the size of the money package to better fit into hidden car compartments.

133.   At approximately 4:55 p.m. agents conducting surveillance observed GONORGA meet with TORRES-GARCIA in the parking lot of a McDonald's restaurant at 125 Windsor River Rd., Windsor, California.   The meeting occurred inside a black Ford F-150 being driven by GONGORA.   After the meeting, TORRES-GARCIA exited the Ford F-150, returned to the Chevrolet Camaro that he was driving, and both parties departed the location.

After the exchange, at approximately 5:02 p.m., agents intercepted a conversation between DELGADILLO and GONGORA:

| | |
|---|---|
| DELGADILLO: | What's up Carlitos? |
| GONGORA: | It's it's right here.   It's done uh… Listen. |
| DELGADILLO: | Yeah? |

GONGORA:        He didn't, he didn't bring it in tape. It's in rubber bands. I don't

                know if what he gave me is right, but it's there.

134.    At approximately 6:13 p.m., Sonoma County Sheriff's conducted a traffic stop on the

Chevrolet Camaro.   During the stop, officers identified TORRES-GARCIA by his California

driver's license.

### August 13, 2018: CS-3 Purchase of Heroin from MCCOY, Who Was Assisted by GAMBOA

135.    On August 13, 2018, agents directed CS-3 to contact MCCOY on TT-1 to arrange for a

meeting with MCCOY at a Home Depot located at 2300 N. Park Blvd., Pittsburg, California to

purchase a quantity of heroin.   MCCOY and CS-3 engaged in multiple calls during which they

discussed the quantity of heroin that MCCOY would be willing to sell to CS-3 in exchange for

$7,000.

136.    At approximately 1:00 pm, agents established surveillance in the area of the Home Depot

in anticipation of the drug transaction involving CS-3 and MCCOY.   At approximately 1:15

p.m., agents saw CS-3's vehicle park at the Home Depot parking lot.   Two minutes later, agents

intercepted a call between MCCOY using TT-1 and GAMBOA, during which MCCOY and

GAMBOA were discussing the set up and use of hand held radios to conduct counter

surveillance during the drug transaction.

137.    At approximately 1:25 p.m., agents saw MCCOY driving a blue Nissan registered to

MCCOY, and GAMBOA driving a grey Infiniti registered to GAMBOA's wife, in the vicinity of

2225 Cordoba Way, Antioch, California, an address associated with Rodolfo HERNADEZ.   A

series of calls intercepted around this time led agents to believe that MCCOY may have obtained

narcotics from HERNANDEZ's residence.

138.    At approximately 1:52 p.m., agents saw GAMBOA park the Infiniti at the Home Depot

facing CS-3's vehicle.   At that time, agents observed GAMBOA using a hand held radio.   At

the same time, agents intercepted a call between MCCOY using TT-1 and GAMBOA using

(415) 619-9770.   The following is a relevant portion of the conversation:

MCCOY:      They look at every person in every motherfucking car.

GAMBOA:    What's up? [Radio static]

MCCOY:      Huh?

GAMBOA:    Hey, that's a walkie talkie.

MCCOY:      Yeah, hey, go to number…hey, go to five.

GAMBOA:    [Aside: How are you doing?] [Computerized radio voice: three, four, six, four, five.] The coast is clear.

MCCOY:      Yeah. Can you hear me?

GAMBOA:    We clear.   Did you hear me?

MCCOY:      Yup. If we can get that light to change right now we'll get up out of here. There's your Camaro.

GAMBOA:    Alright, I'm…I'm parked right in front of him. He's like a few rows back. I'm watching the whole parking lot. Where you at?

MCCOY:      I'm way out by Winco.

139.   Later in the conversation, MCCOY and GAMBOA discussed several persons they believe to be suspicious in the parking lot and changed the location of the drug deal.   GAMBOA then informed MCCOY that he would follow CS-3 out of the parking lot.

140.   MCCOY and CS-3, speaking on an intercepted call, agreed to meet at the Chevron gas station located at 1235 California Ave.   During the meeting, which occurred inside CS-3's vehicle, CS-3 gave MCCOY $7,000.00 and MCCOY provided CS-3 with the suspected heroin.

141.   During the meeting, agents observed GAMBOA drive behind CS-3's vehicle in the Infiniti.   While in CS-3's vehicle, CS-3 asked MCCOY who was in the grey car.   MCCOY said "that's my boy" and informed CS-3 that GAMBOA was "making sure we good."

142.   Following the controlled purchase transaction, the suspected heroin was sent to the DEA's Western Laboratory for forensic chemical analysis.   The results of the chemical analysis confirmed that the substance, which had a net weight of approximately 205.8 grams, contained

heroin with an approximate substance purity of 57%, yielding an amount of pure heroin of approximately 117.3 grams.

### 1/26/2019: Seizure of Two Kilograms of Cocaine Sourced from Mexico to Be Sold to LEE by Mago AGUILAR Pacheco

143.     During the 30-day interception period from January 22, 2019 to February 20, 2019, agents intercepted a number of calls over TT-2 and TT-5 between LEE and AGUILAR, who was using (786) 683-1828.   Specifically, on January 23 through January 26, 2019, agents intercepted a series of text messages and phone calls over TT-2 and TT-5 suggesting that AGUILAR would meet with LEE to deliver narcotics.   As further described below, this series of intercepted communications ultimately led to the seizure of approximately two kilograms of cocaine from a vehicle being driven by AGUILAR on January 26, 2019.

144.     Specifically, on January 23, 2019 at approximately 4:35 p.m., agents intercepted a call between LEE using TT-5 and AGUILAR using (786) 683-1828.   The following are relevant excerpts from this intercepted conversation:

| | |
|---|---|
| AGUILAR: | Hello? |
| LEE: | Hey how are you doing? |
| AGUILAR: | Good. |
| LEE: | Listen, yeah, I didn't I didn't get the last part, I didn't, but listen. Yeah like you said I, I, Saturday, I'll be ready for probably two more. |
| AGUILAR: | Okay. |
| LEE: | Yeah |
| AGUILAR: | Okay. |
| LEE: | Yeah , yeah that's, that's all I was saying. I was saying I could probably do more if, if you know, you got a better number. |
| AGUILAR: | Uh huh. |
| LEE: | Oh okay. Yeah, that's all I was saying.   If it was cheaper, that was it. Yeah.. |

| AGUILAR: | Okay, Saturday for the two. The white no? |
|---|---|
| LEE: | Yes. |
| AGUILAR: | Okay. |
| LEE: | Listen the guy have it. I told him about the mashed potatoes, the black, he hasn't called back yet. |
| AGUILAR: | Uh huh, okay, okay, no problem. |
| LEE: | Yeah, but I, I, I, told him already so. He said he is going to let me know. |
| AGUILAR: | Okay (U/I) for two. |
| LEE: | Okay, I'll call you. |

145.    I believe that LEE and AGUILAR were communicating about AGUILAR delivering

suspected narcotics to LEE on Saturday, January 26, 2019.   When LEE informed AGUILAR,

"Saturday, I'll be ready for probably two more," I believe LEE was informing AGUILAR that he

expected to need "two more" of a specific quantity (likely kilograms) of narcotics.   When

AGUILAR said, "Saturday for the two" and asked LEE, "The white no?" I believe AGUILAR

was confirming with LEE that he wanted two kilograms of cocaine.   Drug traffickers often refer

to cocaine as "white," based on its white appearance.

146.    On January 24, 2019, Homeland Security Investigation (HSI) notified DEA agents that

AGUILAR had crossed the Otay Mesa Port of Entry (POE) into Mexico.   The following day, on

January 25, 2019, HSI notified DEA that AGUILAR had crossed the Otay Mesa POE back into

the United States.   I believe that AGUILAR's brief trip to Mexico was made for the purpose of

sourcing the narcotics that he was to deliver to LEE.   Based on my training and experience, it is

common practice for drug couriers to make quick trips to and from Mexico to obtain narcotics

from their sources of supply, for customers in the United States.   Trips such as these typically

decrease the price paid for narcotics, as drug prices in the United States are commonly higher

than prices in Mexico because of a mark-up for the risk of smuggling the narcotics into the

United States.   Thus, buying and transporting narcotics from Mexico to the United States yields

more profit for the courier, as the narcotics can be sold for a higher amount in the United States.

147.    On January 25, 2019, several text messages were intercepted from phone number (786) 683-1828, the number believed to be used by AGUILAR, to LEE over TT-2 regarding the suspected coordination of a narcotics transaction discussed two days earlier.   Specifically, AGUILAR sent LEE a string of text messages stating, "Hey friend I have 3, the truth is I know you want a better number I can go lower $100 por piece.   Don't think I make much with them, the truth I try to always get a good number for my account and I will give you a better one too…"   Several minutes later, a text message from LEE, using TT-2, to AGUILAR, using phone number (786) 683-1828, was intercepted stating, "Ok thanks 24 8 ok for now I can do more with good number I call u tomorrow when I'm ready to leave."

148.    Based on the context of these text messages, and the seizure discussed further below, I believe that AGUILAR was telling LEE that he (AGUILAR) could discount the price of narcotics for LEE by $100 per "piece" (i.e., a quantity of narcotics believed to be kilograms) when AGUILAR wrote, "I know you want a better number I can go lower $100 por piece." Furthermore, I believe that LEE was referring to the price of the suspected narcotics when LEE wrote, "Ok thanks 24 8 ok for now."   Specifically, I believe that LEE was confirming with AGUILAR that the offered price of $24,800.00 per kilogram of suspected cocaine was reasonable, but that LEE could buy more narcotics with lower prices.

149.    The following day, January 26, 2019, at approximately 1:08 p.m., a text message was intercepted between LEE over TT-2 from AGUILAR using (786) 683-1828 that read, "Hey I'm ready.   Two or three?"   One minute later, LEE responded by text message to AGUILAR, stating, "Tow [sic] for sho," and AGUILAR further responded, "Ok I have a trip up there too? Half way?"   In this exchange, I believe that AGUILAR was asking LEE how many kilograms of narcotics LEE wanted when asking, "Two or three?"   I believe that LEE confirmed he wanted two kilograms when he stated, "Tow for sho."   Furthermore, I believe that AGUILAR was asking LEE if LEE wanted to meet halfway between LEE's residence in Antioch, California and AGUILAR's suspected residence in West Covina, California, when AGUILAR said, "Halfway?" As discussed further below, these interpretations were corroborated by the seizure of two

kilograms of cocaine from AGUILAR later that afternoon as AGUILAR was driving north on Interstate 5 apparently to meet LEE.

150.    Later that afternoon, at approximately 2:56 p.m., agents intercepted a call over TT-2 from LEE to AGUILAR at phone number (786) 683-1828 in which LEE stated that he intended to pick up the money, or "tickets," for the suspected narcotics transaction with AGUILAR prior to meeting AGUILAR at a Denny's halfway between LEE's residence and AGUILAR's residence.

152.    Location data for LEE's phone (TT-5) reflected that as of approximately 4:08 p.m., 4:39 p.m., and 5:39 p.m., the device was heading southbound on the Interstate 5 in the direction of Bakersfield, California, initially from LEE's residence located in Antioch, California.   Location data for AGUILAR's phone ((786) 683-1828) at approximately 4:24 p.m. and the ultimate stop (described below) at approximately 4:45 p.m. reflected that the device was heading northbound in the direction of Bakersfield, California, from AGUILAR's suspected residence in West Covina, California.

153.    At approximately 4:45 p.m., DEA agents coordinated with the Inland Regional Narcotics Task Force (IRNET) to conduct a traffic stop on the vehicle being driven by AGUILAR, which IRNET had identified and was tracking using location monitoring and mobile surveillance. During the traffic stop, two kilograms of cocaine were seized from the vehicle.   Law enforcement investigators confirmed that the driver was Mago AGUILAR Pacheco based on his driver's license presented during the stop.   The two kilograms of cocaine seized from AGUILAR's vehicle were later sent to the DEA's Western Regional Laboratory, where they tested positive for cocaine.

154.    Later that same day, at approximately 6:45 p.m., a text message was intercepted from LEE using TT-2 to phone number (786) 683-1828.   The text message read, "At denny's." Moments later, GPS location data for TT-2 and TT-5 indicated that the devices were located at a Denny's with an address of I-5, CA-46, Lost Hills, California 93249.   At approximately 7:55 p.m., a text message was intercepted from LEE using TT-5 (instead of TT-2) to phone number (786) 683-1828, stating "been here hour." Approximately five minutes later, LEE used TT-5 to

send the follow-up text message, "I am leaving.   Headed home."   AGUILAR did not respond as he had been taken into custody.

155.    The next day, on January 27, 2019, at approximately 3:10 p.m., a call was intercepted to LEE over TT-5 from phone number (213) 260-5439.   During the call, a male, whom agents believe to be AGUILAR based on a voice comparison to the voice intercepted over phone number (786) 683-1828 and on the content of the intercepted call (set forth below), first spoke to LEE and then handed the phone to an unidentified female (hereinafter "UF").   The following is a relevant excerpt from this intercepted call:

| | |
|---|---|
| LEE: | Hello. |
| AGUILAR: | Lorenzo. |
| LEE: | Hey man you scared me [U/I] shit. |
| AGUILAR: | Are you scared? |
| LEE: | Yeah you scared me I thought something happened. |
| AGUILAR: | Hold on.   (AGUILAR instructs a third female party to speak on the phone to LEE) |
| LEE: | Yeah tell him he scared me.   I'm glad to hear his voice.   I was coming down in the morning. |
| UF: | Yeah no, no, no, no, don't and not at all and he says for you to change your number. |
| LEE: | Okay, what happened? |
| UF: | He ah, he got stopped yesterday.   He just got released this morning. |
| LEE: | Okay.   Did they find anything? |
| UF: | Ah, that's what we are in the middle of.   Just change your phone number. This is a new number for him. |
| LEE: | Okay, alright.   This is a new one.   Listen I'mma promise you, I fitting to get another damn phone today. |
| UF: | Okay. |

| LEE: | Okay, shit.   But I'm glad, I'm glad he is okay. |
| UF: | Yeah. |
| LEE: | Yeah.   Shit. |
| UF: | Okay. |
| LEE: | Okay.   Listen. |
| UF: | I'll wait for your call from a different number. |
| LEE: | Okay, that's no problem.   Yeah and yeah 'cause ah okay I'll call you, ah, shit.   I'm on my way to a party.   Listen I'mma call you, I got another number, don't worry about it.   I got another number and I'mma call you in about 15 minutes. |
| UF: | Sounds good, |
| LEE: | Okay. |
| UF: | Bye. |

156.   The foregoing indicates that AGUILAR was transporting the two kilograms of cocaine in order to deliver them to LEE.

**FEBRUARY 9, 2019: Intercepted Calls Arranging Shipment of Drugs From Mexico-Based Source ("JUAN") to LEE, Resulting in the Seizure of: 1) Seven Kilograms of Cocaine and $104,505 from a Vehicle Driven by Courier Cesar ALVARADO; and 2) 20 Pounds of Methamphetamine and One Kilogram of Cocaine Discarded from a Vehicle Driven by Evan MARTINEZ-DIAZ**

157.   The events set forth below center around two different individuals, ALVARADO and MARTINEZ-DIAZ, who were sent to LEE's residence (**Target Premises #1**) by Mexican-based source "JUAN" to drop-off and pick-up narcotics for the DTO.

158.   I submit that the evidence below establishes that ALVARADO arrived to **Target Premises #1** first to deliver five kilograms of cocaine in exchange for $100,000 in cash from LEE.   Acting at the direction of "JUAN," ALVARADO also left at **Target Premises #1** 20 pounds of methamphetamine and one kilogram of cocaine.

159.    After ALVARADO left **Target Premises #1**, law enforcement conducted a traffic stop of ALVARADO's vehicle and seized seven kilograms of cocaine and $104,505 in cash.

160.    After ALVARADO departed **Target Premises #1**, the second individual, MARTINEZ-DIAZ, arrived at **Target Premises #1** to pick up the 20 pounds of methamphetamine and one kilogram of cocaine left by ALVARADO.   Law enforcement seized these drugs after MARTINEZ-DIAZ discarded them from his vehicle after detecting law-enforcement surveillance.

161.    On February 8, 2019, the day before the seizures, agents intercepted phone calls over TT-5 indicating that "JUAN" would be sending a courier to LEE's residence to deliver narcotics. On February 8, 2019 at approximately 11:49 a.m., agents intercepted a call between LEE using TT-5 and "JUAN" using +52-653-131-9358:

| | |
|---|---|
| JUAN: | What's happening? |
| LEE: | Hey what's up Juan?   How we looking? |
| JUAN: | We looking good. |
| LEE: | Okay, the guy just called me again, I was just checking. |
| JUAN: | [U/I] They do it today. |
| LEE: | Huh? |
| JUAN: | They'll do it today. |
| LEE: | Ok, they'll see me today? |
| JUAN: | Yeah. |
| LEE: | Ah, okay then my friend. I'm going to call him back and let him know that everything is ok. |
| JUAN: | I'll check with the guy what time he gonna be there. To see if he can [U/I] grab the money back. |
| LEE: | Ok. Well Juan, Yeah, well just always call me before, you know that |
| JUAN: | Yeah. |
| LEE: | Yeah. (Voices overlap) Just tell him to call me about 30 minutes before. |

| JUAN: | Yeah, how much, how much tickets do you have now? |
|---|---|
| LEE: | Juan, I'm pretty sure ... I'm working on the last one ... It's one, we got one for sure Juan. |
| JUAN: | Yeah, ok. |
| LEE: | Yeah. |
| JUAN: | Oh, okay. |
| LEE: | One hundred, you know what I mean. One hundred. Yeah. |

162.   At approximately 11:43 pm, agents observed a black sedan park in front of **Target Premises #1**.   The sedan's license plate was 8DWL752.   A DMV check revealed the sedan was registered to Cesar ALVARADO.   The driver of the vehicle remained inside the vehicle throughout the night, apparently sleeping in the car.

163.   On February 9, 2019, at approximately 7:22 a.m., a call was intercepted between LEE using TT-5 and "JUAN" using +52-653-131-9358.   The following is a relevant excerpt from this call:

| LEE: | Hello? |
|---|---|
| JUAN: | Hey, what's happening big boss? |
| LEE: | Alright. He's outside sleeping Juan. |
| JUAN: | Oh, ok. |
| LEE: | Yeah, he'd been there for a while. He pulled up last night about 12:30, so I didn't bother him. I went out there, he was stretched out in the car, so I didn't bother him. |
| JUAN: | Yeah, ok. |
| LEE: | Yeah, so he is here. Yeah, he is here. |
| JUAN: | You haven't opened anything yet? |
| LEE: | No, I haven't opened up nothing yet. |
| JUAN: | Ok, cause he gonna leave you about 20 [U/I] who give you the money last night. |

LEE:        Yeah, yeah, he told me to call him. He left his number, told me to call

            him.   When the guy wakes up and get ready to leave [U/I] his pieces.

JUAN:       Yeah, yeah... He gonna leave him 20 onions and 1 apple

LEE:        Ok.

JUAN:       And he gonna give you 5 onions and uh...

LEE:        5 apples. Yeah.

JUAN:       5 apples and 1 mashed.

164.   At approximately 8:38 a.m., the garage to **Target Premises #1** opened.   LEE moved a

truck parked in the driveway to the street, so that ALVARADO could park in the driveway of

**Target Premises #1**.   After the car was parked in the driveway, ALVARADO removed two

dark colored bags from the trunk of the vehicle and took the bags into the garage of **Target**

**Premises #1**.   Later, ALVARADO removed a red bag from the trunk of the sedan and carried it

into the garage of **Target Premises #1**.

165.   At approximately 8:57 a.m., a call was intercepted between LEE using TT-5 and "JUAN"

using +52-653-131-9358.   The following is a relevant excerpt from this call:

JUAN:       What's happening?

LEE:        Hey my friend, hey listen...

JUAN:       Yep.

LEE:        Everything is here.

JUAN:       Ok.

LEE:        Ok listen. I'm sending 100 Juan.

JUAN:       Ok.

LEE:        He's got 100.   Everything else I got 5 and 1 for the friend. And I got the

            mashed potato.

JUAN:       Did he leave you the onions?

LEE:        Yeah, I didn't open that shit. So I don't know whatever the fuck that is,

            that's what it is. [U/I] left two fucking bags. I'm [U/I] call the guy right

now, but whatever it is, that's what it is. I didn't open that shit.

166.   I believe that LEE's reference to "100" means $100,000 in cash that LEE provided to ALVARADO in exchange for the five kilograms of cocaine "apples" that ALVARADO delivered to LEE.

167.   At approximately 8:59 a.m., agents saw ALVARADO exit the garage of **Target Premises #1** carrying a light colored bag.   ALVARADO opened the rear driver side door of his vehicle and moved around in the area between the rear driver side space and the opened door. At approximately 9:22 a.m., ALVARADO's vehicle departed **Target Premises #1**.   Following ALVARADO's departure, agents conducted a traffic stop, seizing approximately seven kilograms of suspected narcotics, two telephones, and approximately $104,505.   The suspected narcotics were later sent to the DEA's Western Regional Laboratory, where they tested positive for cocaine.

168.   On February 9, 2019, at approximately 10:13 a.m., following ALVARADO's delivery to LEE's residence, LEE (using TT-2) contacted MCCOY at TT-1 to tell MCCOY about the delivery and to ask MCCOY how much he needed.   During the call, LEE stated to MCCOY, "You get first dibs. You get whatever the fuck you want."

169.   On February 9, 2019, at approximately 9:00 a.m., a call was intercepted between LEE using TT-5 and Evan MARTINEZ-DIAZ who was using telephone number (925) 329-1710. The following is a relevant excerpt from this call:

| | |
|---|---|
| MARTINEZ-DIAZ: | Hello |
| LEE: | Hey, hey my friend. It's here waiting on you. |
| MARTINEZ-DIAZ: | Huh? |
| LEE: | It's here waiting on you. The onions. |
| MARTINEZ-DIAZ: | Oh, yeah. I'll go right now. |
| LEE: | Ok good. Good. Yeah, he's got 20 of them here for you. |

170.   I believe that LEE's reference to "the onions" refers to the 20 pounds of methamphetamine that ALVARADO had left at **Target Premises #1**.   At approximately 9:54

a.m., agents observed a black truck park in the driveway of **Target Premises #1**. Agents observed the California license plate of the truck as 73399R1. A DMV check revealed the truck was registered to Maribele Martinez, at 21 Inlet Dr., Bay Point, California (**Target Premises #8**).

171. Agents observed Anthony BROWN exit **Target Premises #1** and remove two dark colored bags with white lettering from a trash can outside the garage of **Target Premises #1** and place the bags into the back of the black truck. Agents also observed a male wearing a red-colored jacket, later identified as MARTINEZ-DIAZ, meet with LEE and BROWN in the entrance to the garage of **Target Premises #1**. Agents later observed the truck depart the area of **Target Premises #1**.

172. Agents attempted to maintain surveillance on the black truck, but were unable to do so as the black truck engaged in counter-surveillance maneuvers by driving erratically. At approximately 10:00 a.m., agents observed the black truck parked on Hidden Hills Way, Antioch, California, with MARTINEZ-DIAZ standing outside of the vehicle. Local law enforcement later pulled the vehicle over in a traffic stop. During the stop, agents identified the driver as MARTINEZ-DIAZ and the passenger as Miguel PEREZ. During the search, agents did not locate any contraband. In addition, agents did not locate the bags that law enforcement previously observed being loaded into the truck.

173. After the traffic stop, agents recovered bags consistent with those seen being loaded into MARTINEZ-DIAZ's truck at a location on Ferngrove Way, which is close to the location where agents had earlier observed the truck stopped. Agents also obtained video footage from a civilian witness near the location showing a dark truck, consistent with the truck MARTINEZ-DIAZ was driving, stopping on Ferngrove Way. The video showed the truck's passenger exiting from the front passenger side of the truck and placing an object near some trees on the side of the road. In the area depicted on the video, agents recovered a large trash bag with two smaller bags inside. Those smaller bags contained approximately 20 packages of suspected methamphetamine, and one brick like object. Both suspected substances were sent to the DEA

Western Area Laboratory for storage and analysis.   Lab results for the one brick-like object
tested positive for cocaine hydrochloride, and the 20 packages of suspected methamphetamine
tested positive for methamphetamine.

174.   After the seizures, at approximately 11:25 a.m., a call was intercepted between LEE
using TT-5 and "JUAN" using +52-653-131-9358.   "JUAN" complained to LEE that the guy he
sent was followed by the police:

> JUAN:       Hey, look, ah ah, the guy [U/I] who came to get the onions ah um, he got
> followed from your house.

> LEE:   He got what?

> JUAN:       The police ah ah, they follow him.

> LEE:       They stop him?

> JUAN:       Yeah.

> LEE:   (Aside: Get this out of here [U/I]) Where'd they stop him at Juan?

> JUAN:       He said that ah ah, that when he left your house

> LEE:       Is he ok?

> JUAN:       Yeah, he, he, he was a, he throw the stuff. He gonna...

> LEE:   Juan, he couldn't have threw it. Everything was in the back of the truck.

175.   At approximately 11:37 a.m., a call was intercepted between LEE using TT-5 and
MARTINEZ-DIAZ using (925) 329-1710.   MARTINEZ-DIAZ confirmed that he had thrown
the drugs away.   The following is a relevant excerpt from the call:

> MARTINEZ-DIAZ:   Hello?

> LEE:       We were just checking to see if you was alright. Juan said they
> stopped you.

> MARTINEZ-DIAZ:   Bro.. Bro, yeah bro.

> LEE:       Ok, but you alright?

> MARTINEZ-DIAZ:   I threw ah

> LEE:       Huh?

MARTINEZ-DIAZ:  I threw that shit. I threw that shit.

LEE:            How'd you throw all that?

MARTINEZ-DIAZ:  Bro, what the fuck you want me to do?

LEE:            I mean, it was in the back of the truck.

**Additional Intercepted Calls Illustrating the Role of Timothy PEOPLES, aka "Tee" and Anthony BROWN, aka "Ant Man" in the DTO**

176.    Multiple calls intercepted between LEE and PEOPLES and LEE and BROWN suggest that PEOPLES is a frequent customer of LEE's, and that LEE and/or BROWN often deliver narcotics to PEOPLES at **Target Premises #3**.   For example, on May 21, 2018, during the first 30-day interception period, at approximately 2:29 p.m., agents intercepted a call between LEE using TT-2 and PEOPLES using (925) 597-7716.   The following is a relevant excerpt from the call:

LEE:        Hello?

PEOPLES:    Hey can you bring me two babies?

LEE:        On my way Tee.

PEOPLES:    Alright.

177.    Several minutes later, at approximately 2:23 p.m., physical location information for LEE's phone (TT-2) showed that the phone was located in the vicinity of **Target Premises #3**. I believe "babies" is another coded term used by the LEE DTO to covertly describe a particular narcotic and quantity of narcotic, and in this instance "2 babies."   I have no reason to believe that, in the context of these conversations or other similar related intercepted communications during the course of this investigation, the term "babies" refers to actual babies or another non-narcotic-related item.   Furthermore, I believe LEE was telling PEOPLES that he could bring the suspected narcotics to PEOPLES when LEE said, "On my way Tee."[16]

178.    In a more recent example, on January 25, 2019, agents intercepted a sequence of calls

---

[16] I believe that "Tee" is an alias for PEOPLES as his first names is Timothy, and PEOPLES' suspected device is registered to "Tee Peoples."

over TT-2 between LEE, PEOPLES and BROWN, further illuminating how LEE and BROWN work together to deliver drugs to PEOPLES and others.   At approximately 7:35 p.m., agents intercepted a call between LEE using TT-2 and PEOPLES.   During the call, PEOPLES told LEE, "I need an apple," and LEE responded, "Okay.   Tee listen I'm just hitting the freeway in the west, I'll be right there."   Approximately 30 minutes later, agents intercepted a call from LEE using TT-2 to BROWN.   During the conversation LEE told BROWN, "Hey yeah, listen I had to go holler at Tee for an apple real fast.   [U/I] wanted me to run to Walmart for him.   But anyway I'm on my way to see Spice, tell him I'll be there in 10 minutes."   BROWN confirmed and told LEE, "Okay, I'll put a call in right now."

179.   In this series of calls, I believe that PEOPLES asked LEE for cocaine using the coded term "apple," and LEE informed BROWN that he had provided PEOPLES with the cocaine. Additionally, I believe that LEE instructed BROWN to contact a second alleged customer using the alias "Spice," to inform "Spice" that LEE would arrive to the meet location in 10 minutes.   I further believe that when LEE stated to PEOPLES "I'll be right there" and then later stated to BROWN that he "had to go holler at Tee," that this indicates that LEE delivered the suspected cocaine to PEOPLES at **Target Premises 3**.

180.   Following a similar pattern, on February 5, 2019 at approximately 12:25 p.m., agents intercepted a call between LEE using TT-2 and PEOPLES during which PEOPLES requested "four babies" and LEE responded, "Okay give me a minute Tee."   Following the conversation, LEE contacted BROWN and asked BROWN, "We got 4 babies for Tee?"   BROWN responded affirmatively.   LEE then told BROWN that he would pick up BROWN and then they would go see PEOPLES.

181.   At approximately 1:17 p.m., surveillance units in the vicinity of **Target Premises #3** observed BROWN arrive in a Nissan bearing Washington plates, and walk towards the front entrance of **Target Premises #3**.   Moments later, BROWN walked from **Target Premises #3**, entered the Nissan, and departed the location.   Based on a review of the calls and observations made by surveillance units, LEE instructed BROWN to deliver suspected narcotics to PEOPLES

at **Target Premises #3.**

182.     After the February 5, 2019, PEOPLES continued to order more narcotics ("babies") from LEE on the following dates:

| Call Date & Time | Summary of Call |
|---|---|
| 02/06/2019 12:30 hours | PEOPLES said he (PEOPLES) needed 4 "babies."   LEE said he (LEE) would be there in a minute. |
| 02/09/2019 19:05 hours | PEOPLES told LEE he (PEOPLES) needed a "baby."   LEE said to give him (LEE) a couple of minutes. |
| 02/09/2019 22:24 hours | PEOPLES said [U/I] three "babies."   PEOPLES asked what time.   LEE said he (LEE) would be right there. |
| 02/11/2019 13:43 hours | PEOPLE asked for 3 "babies."   LEE agreed and said to give him (LEE) about 20 to 30 minutes. PEOPLE agreed and LEE said he (LEE) would be right there. |
| 02/15/2019 13:26 hours | LEE said hey, what's up TEE.   PEOPLES asked for a "baby."   LEE said to give him (LEE) a minute. |
| 02/15/2019 17:42 hours | LEE greeted PEOPLES. PEOPLES said he (PEOPLES) needed 2 "babies" and asked how long that would take.   LEE said about 10 minutes. PEOPLES said okay. |
| 02/16/2019 12:43 hours | PEOPLE said he (PEOPLES) needs 4 "babies."   LEE asked 4 "babies?" PEOPLES said yes and LEE said okay give me a few minutes. |

E.     **REQUEST THAT A COMPLAINT BE ISSUED**

183.     Based on the foregoing, I believe that there is probable cause to believe that the defendants listed in the following chart are guilty of the violations identified in this chart for each defendant, based on the information identified in the paragraphs listed in this chart.   I therefore request the issuance of a criminal complaint against each named defendant for the offense specified.

| Defendant | Statute(s) Violated by this Defendant | Paragraphs Setting Forth Probable Cause |
|---|---|---|
| Jose Ramon DELGADILLO, aka "Tepa" | 21 U.S.C. § 846 | 98-102, 108-113, 122-134 |
| Marco Antonio DELGADILLO, aka "Tonio" | 21 U.S.C. § 846 | 98, 109-110, 122-128 |
| Lorenzo Edward LEE, aka "O.G." | 21 U.S.C. § 846 | 25-34, 40, 50-64, 75-87, 98-121, 143-182 |
| Anthony BROWN, aka "Ant | 21 U.S.C. § 846 | 57-64, 77-87, 104-108, 171, 176-182, |

| Defendant | Statute(s) Violated by this Defendant | Paragraphs Setting Forth Probable Cause |
|---|---|---|
| Man" | | 188-194 |
| Luis Angel TORRES-GARCIA, aka "Guero" | 21 U.S.C. § 846 | 122-134, 214-216 |
| Evan Deandre MARTINEZ-DIAZ | 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) | 157-175, 212-213 |
| Jeffrey Allen MCCOY | 21 U.S.C. § 846 | 25-97, 135-142, 168, 186 |
| Deshawnte GAMBOA | 21 U.S.C. § 846 | 50-64, 71-72, 82, 88-97, 135-142, 211 |

## F.    REQUEST THAT SEARCH WARRANTS BE ISSUED; LOCATIONS TO BE SEARCHED

184.    Based on the foregoing, together with the additional information pertaining to each

Target Premises set forth below, I believe that there is probable cause to search the following

locations:

| Location | Relevant Attachments | Paragraphs Setting Forth Probable Cause |
|---|---|---|
| Target Premises #1 | A-1 and B-1 | 25-27, 50, 58, 77, 101-111, 113, 117-119, 157-175, 185 |
| Target Premises #2 | A-2 and B-1 | 28, 37, 41, 45, 48, 50-51, 60, 67, 71, 77, 81, 90, 186 |
| Target Premises #3 | A-3 and B-1 | 176-177, 181, 187 |
| Target Premises #4 | A-4 and B-1 | 188-194 |
| Target Premises #5 | A-5 and B-2 | 195-200 |
| Target Premises #6 | A-6 and B-2 | 105, 201-210 |
| Target Premises #7 | A-7 and B-2 | 51, 88, 91, 95-97, 211 |
| Target Premises #8 | A-8 and B-1 | 170, 212-213 |
| Target Premises #9 | A-9 and B-1 | 128, 214-216 |

## Target Premises #1: 4608 Nopah St., Antioch, California (Residence of Lorenzo LEE)

185.    I believe that **Target Premises #1** is the current residence of Lorenzo LEE.    During the

course of the investigation, law enforcement successfully surveilled LEE numerous times at

**Target Premises #1**, and LEE provided **Target Premises #1** as his address to others.    Court-

authorized location monitoring on TT-2, TT-3 and TT-5, all used by LEE, detailed that the

devices were consistently in the vicinity of **Target Premises #1** late at night and early in the morning.    Furthermore, TT-2 is subscribed to Lorenzo LEE at **Target Premises #1**.    Video footage captured by a pole mounted camera located in the vicinity of **Target Premises #1** depicts LEE frequently arriving to and departing the residence, as well as conducting drug trafficking activities at **Target Premises #1**, as set forth above.    Additionally, law enforcement database queries list **Target Premises #1** as a current residence for LEE.    Finally, mail cover responses for **Target Premises #1** listed LEE as a mail recipient at the address.

### Target Premises #2: 696 Carpino Ave., Pittsburg, California (Residence of Jeffrey MCCOY)

186.    I believe that **Target Premises #2** is the current residence for Jeffrey MCCOY.    During the course of the investigation, law enforcement successfully surveilled MCCOY numerous times while using court-authorized location monitoring on TT-1 to identify MCCOY's likely location, thereafter observing MCCOY at **Target Premises #2**.    Moreover, video footage captured by a pole mounted camera located in the vicinity of **Target Premises #2** depicts MCCOY frequently arriving to and departing **Target Premises #2**.    MCCOY's California Department of Motor Vehicles (DMV) driver's license indicates that **Target Premises #2** is his address.[17]    A Nissan bearing California license plate 7LPD611, a vehicle agents have observed parked at **Target Premises #2** and being driven by MCCOY, is registered to MCCOY at **Target Premises #2**.    Additionally, law enforcement database queries list **Target Premises #2** as a current residence for MCCOY.    Furthermore, mail cover responses for **Target Premises #2** listed MCCOY as a mail recipient at the address.

### Target Premises #3: 3605 Baywood Cir., Antioch, California (Residence of Timothy PEOPLES)

187.    I believe that **Target Premises #3** is the current residence for Timothy PEOPLES.

---

[17] On June 15, 2018, MCCOY changed his address with DMV to 692 Carpino Ave., Pittsburg, CA.   However, pole camera and physical surveillance show that MCCOY has continued to reside at **Target Premises #2** after June 15, 2018.   I believe that MCCOY fraudulently changed his address with DMV to avoid detection by law enforcement.

During the course of the investigation, law enforcement successfully surveilled PEOPLES at **Target Premises #3**.   Law enforcement database queries detail that **Target Premises #3** is an address associated with PEOPLES' suspected girlfriend, Cresensia ALLEN.   Facebook queries conducted on April 9, 2019 of ALLEN support that ALLEN and PEOPLES are in a relationship. Furthermore, the intercepted communications in correlation with physical location information for TT-2, and physical surveillance at **Target Premises #3**, indicate that LEE or BROWN often delivered suspected narcotics to PEOPLES.

### Target Premises #4: 1064 Clearland Dr., Bay Point, California (Residence of Anthony BROWN)

188.    I believe that **Target Premises #4** is the current residence for Anthony BROWN. Specifically, during the course of the investigation, law enforcement successfully surveilled BROWN in the vicinity of **Target Premises #4**.   BROWN's California driver's license lists **Target Premises #4** as his current address.   Historical cell site information for BROWN's suspected device, (925) 238-5918, between January 21 and February 20, 2019, shows that the device was located in the vicinity of **Target Premises #4** 114 times and **Target Premises #1** 365 times.   Additionally, law enforcement database queries list **Target Premises #4** as a current residence for BROWN.

189.    As detailed above, BROWN is a close associate of LEE's who assists LEE with LEE's narcotics trafficking activities for the DTO.   Evidence including intercepted calls, cell phone location monitoring, and physical surveillance indicates that LEE maintains a stash of narcotics at BROWN's residence, **Target Premises #4.**   For instance, several calls were intercepted detailing that LEE arranged to pick up BROWN from **Target Premises #4,** as well as deliver and pick up suspected narcotics to/from **Target Premises #4.**

190.    For example, On August 1, 2018 at approximately 1:40 p.m., agents intercepted a conversation between LEE utilizing TT-2 and BROWN using (925) 238-5918.   The following is a relevant portion of the conversation:

| | |
|---|---|
| BROWN: | What you doing sir? |
| LEE: | Sitting here eating a burrito looking at [U/I]. |
| BROWN: | Oh okay, you have to [U/I]? |
| LEE: | Huh? |
| BROWN: | Yeah I was going to see if you could bring me one of those half burritos when you come pick me up buddy? |
| LEE: | Okay, when you gon' be ready? |
| BROWN: | Ah shoot, right now. I [U/I] so I'm at the house right now. |
| LEE: | Okay [U/I], I'm going to finish this burrito, I'm fittin to go get the other half burrito and I'll be right there. |
| BROWN: | Okay no problem, yeah half a burrito, gotcha. |
| LEE: | See you in a minute. |

191.    I believe that when BROWN asked LEE if LEE could, "bring me one of those half burritos when you come pick me up," that BROWN was asking LEE to bring BROWN a specific quantity of narcotics to BROWN at **Target Premises #4.**   As described above, I know that it is common practice for members of the LEE DTO to use food-related terms such as "apples," "mashed potatoes," and "onions" as code for narcotics.   I believe that LEE and BROWN are using the term "burrito" in the same way in this conversation.   Physical location information for LEE's phone at 2:32 p.m., indicated that TT-2 was on Clearland Dr., Bay Point, California which is the street location of **Target Premises #4.**

192.    Additionally, during the final 30-day interception period, a similar call was intercepted between LEE using TT-2 and BROWN using (925) 238-5918, on February 5, 2019, at approximately 12:25 p.m.:

| | |
|---|---|
| LEE: | We got 4 babies for Tee? |
| BROWN: | Yeah, yeah, it's a, it's an apple in the bag. |
| LEE: | Okay, well I'm on my way to get you then if you waiting. |
| BROWN: | Okay, yeah, I'm waiting. I'm, I'm out here drinking a beer. |

| LEE: | You're, okay you at the spot? |
|---|---|
| BROWN: | Yeah I'm at the house. |
| LEE: | Okay listen I'm on my way, I'm walking out the door right now. |
| BROWN: | Okay no problem. |
| LEE: | Okay, then we'll get Tee when we get back. |

193.   I believe that LEE was asking BROWN if BROWN knew the amount of suspected narcotics that remained to provide to PEOPLES, who goes by the alias "Tee." Furthermore, LEE asking BROWN about the amount of suspected narcotics or that remained for "Tee" and BROWN responding in the affirmative, followed by LEE telling BROWN that LEE would pick BROWN up before going to deliver the suspected narcotics to "Tee," further indicates that BROWN and LEE store narcotics at **Target Premises #4**.   At approximately 12:50 p.m., 25 minutes after the call between LEE and BROWN, physical location information for TT-5, an additional suspected device for LEE, detailed that the device was located on Clearland Dr., Antioch, California, the street location of **Target Premises #4**.

194.   As BROWN is a close associate of LEEs, I believe that LEE trusts BROWN enough to maintain narcotics at his residence.   I know that drug traffickers often place family members and/or close associates in charge of maintaining stash houses and other locations where drugs and drug proceeds are stored, to assure that the drugs and/or money will be safeguarded efficiently.   Based on the foregoing, I believe there is probable cause that **Target Premises #4** contains evidence relating to the narcotics trafficking activities of the LEE DTO.

### Target Premises #5: 698 Carpino Ave., Pittsburg, California (Residence of Kevin MCCOY)

195.   I believe that **Target Premises #5** is the current residence for Kevin MCCOY.   During the course of the investigation, law enforcement successfully surveilled Kevin MCCOY in the vicinity of **Target Premises #5**.   Moreover, review of pole-mounted camera in the vicinity of Jeffrey MCCOY and Kevin MCCOY's residences display Kevin MCCOY at **Target Premises**

#5 repeatedly.   Kevin MCCOY's California driver's license lists **Target Premises #5** as his current address.   Law enforcement database queries list **Target Premises #5** as a current residence for Kevin MCCOY.   Furthermore, during the course of the three 30-day interception periods, Kevin MCCOY was intercepted over TT-2 using telephone number (925) 812-3454 to communicate with LEE.   (925) 812-3454 is registered to Faye BOSTICK at **Target Premises #5**.

196.     Agents believe that Kevin MCCOY is the brother of Jeffrey MCCOY and a frequent narcotics customer of LEE's.   During the three 30-day interception periods, Kevin MCCOY (using (925) 812-3454) was intercepted communicating with LEE (TT-2) about LEE delivering narcotics to Kevin MCCOY at **Target Premises #5**.   For example, on August 3, 2018, a call was intercepted between LEE and Kevin MCCOY, during which Kevin MCCOY told LEE that he needed to see LEE.   LEE asked if Kevin MCCOY needed "apples" and Kevin MCCOY said that he did not, but said that he needed "gravy."   LEE corrected Kevin MCCOY and said "mashed potatoes," further informing Kevin MCCOY that LEE would have it later and that he "don't keep that around."   At approximately 8:14 p.m., agents intercepted another call between LEE and Kevin MCCOY.   LEE informed Kevin MCCOY that he was "waiting on Ant Man [Anthony BROWN], as soon as he gets back with my truck, I'mma go get it."   Kevin MCCOY told LEE that he needed "2 mashed potatoes."   LEE once again informed Kevin MCCOY that when the truck returned LEE would go get it.

197.     In a more recent example, on January 22, 2019, agents intercepted a series of conversation between LEE at TT-2 and Kevin MCCOY at (925) 812-3454.   The following is a relevant portion of the conversation intercepted at approximately 4:04 p.m.:

| | |
|---|---|
| LEE: | What's up baby boy? |
| Kevin MCCOY: | Hey I just, I just didn't want you to forget about me. |
| LEE: | No listen, I was just putting it in my, in my pocket right now. |
| Kevin MCCOY: | Oaky. |
| LEE: | Okay, I'll see you in a couple. |

198.    At approximately 4:53 p.m., another call was intercepted between LEE and Kevin

MCCOY, using the same numbers:

| | |
|---|---|
| Kevin MCCOY: | Hello? |
| LEE: | Coming down the street now baby boy. |
| Kevin MCCOY: | I'm out in the street right now. |
| LEE: | Okay. I think I see you. |

199.    At approximately 4:56 p.m., physical location information for TT-2 showed that the

device was located on Carpino Ave., Pittsburg, California, in the vicinity of **Target Premises #5.**

Based on a review of the conversation, my knowledge of the investigation, conversations with

other agents, and physical location information of TT-2, I believe that Kevin MCCOY was

requesting narcotics from LEE, and that LEE delivered the requested narcotics to MCCOY's

residence, **Target Premises #5.**

200.    Over the course of the interception periods, agents noted numerous pertinent calls

between Kevin MCCOY and LEE.   The following chart sets forth this pattern of additional

drug-related communications not referenced above.   Given the longevity, volume, and substance

of the communications, I believe that **Target Premises #5** will contain evidence relating to the

activities of the DTO.

| Call Date and Time | Summary |
|---|---|
| 05/08/2018 18:33 hours | LEE and KEVIN discuss a delivery of drugs.   KEVIN asked how long. LEE stated that he didn't know, that LEE called a third party who told LEE that he was sending two this week. |
| 05/10/2018 at 16:28 hours | KEVIN asked LEE for 2 "babies." LEE told KEVIN to come to LEE's. KEVIN indicated that he was going to send someone else. |
| 05/10/2018 16:32 hours | KEVIN said that a third party (possibly his customer) going to hold off |
| 05/21/2018 19:29 hours | KEVIN MCCOY asked LEE if he had a friend around there that might have some mashed potatoes.   LEE said he got a call and was told that there might be something tomorrow. |
| 08/10/2018 20:08 hours | KEVIN asks if he is bothering LEE when he (KEVIN) calls to ask for mashed potatoes.   LEE says that he doesn't care and says he doesn't make anything |

| Call Date and Time | Summary |
|---|---|
| | off of that crap. |
| 08/10/2018 21:55 hours | LEE says he is going to go get it right now.   KEVIN says he wants two.  LEE tells KEVIN he is going to go get it. |
| 08/10/2018 23:20 hours | LEE tells KEVIN that he was about to call him and tells him to head in. |
| 08/10/2018 23:32 hours | LEE apologizes and says that he had friends over and forgot to call him.  LEE says that he is waiting on him. |
| 08/13/2018 22:05 hours | KEVIN asks if LEE has mashed potatoes.   LEE says he is going to check, but it might not even be a whole one and agrees to call KEVIN back. |
| 08/13/2018 22:16 hours | LEE asks if one mashed potatoes or two.   KEVIN tells LEE to let him finish counting real quick and he will call LEE right back. |
| 08/13/2018 22:32 hours | KEVIN explains he is 2 short to get 2 mashed potatoes.   KEVIN says he can buy one and a half or 2.   LEE says he got them all put together. KEVIN acknowledges and says he will show up at 11:00 to get the other one. KEVIN says he is on his way. |
| 08/13/2018 22:54 hours | KEVIN notifies LEE that he is outside.   LEE asks KEVIN to open the door and says he is there. |
| 01/25/2019 17:41 hours | KEVIN said his (KEVIN's) friend was wondering if the number (possibly narcotics price) was still the same of the "big daddy."   KEVIN said his friend wanted to buy the half of "big daddy."   LEE said yes, and the number (possibly narcotics price) was still the same.   KEVIN said he would let him (friend) know.   LEE said whenever he (KEVIN) was ready, they (LEE and KEVIN) would be good (to go). |
| 1199 02/09/2019 19:11 hours | KEVIN said his partner would be ready for KEVIN to come see him (partner) tomorrow.   KEVIN asked if LEE had any more.   LEE said they "peeled" them (possibly narcotics) and "mashed" them (possibly narcotics) today. |

**Target Premises #6: 3412 Serpentine Dr., Antioch, California (Residence of Deborah POLK)**

201.    I believe that **Target Premises #6** is the current residence for Deborah POLK.   During the course of the investigation, law enforcement successfully surveilled POLK at **Target Premises #6**.   Agents have also observed POLK driving a Toyota, bearing California license plate MKK2MIA, registered to POLK at **Target Premises #6**.   Additionally, POLK's California driver's license lists **Target Premises #6** as her current address.   Additionally, law enforcement database queries list **Target Premises #6** as a current residence for POLK.

202.    Agents believe that POLK is a stash house operator for the LEE DTO.   Multiple calls

were intercepted between LEE and POLK at (925) 698-0098 during the three 30-day interception periods suggesting that POLK safeguards cash and/or narcotics for LEE at **Target Premises #6**. For example, on April 25, 2018, at approximately 3:08 p.m. agents intercepted a call between LEE at TT-2 and POLK at (925) 698-0098, which is subscribed in POLK's name at **Target Premises #6**. During the telephone call, LEE asked if POLK recalled when LEE purchased POLK a "lunch" and then "another lunch" and LEE stated that POLK put the "lunches" together. LEE informed POLK that LEE was stressed as he could not locate where the combined lunches were. POLK stated that POLK gave them to LEE. LEE stated that he was going to check one more spot.

203. On April 27, 2018, after the controlled purchase operation between MCCOY and CS-3 for 9 ounces of suspected crack cocaine which LEE provided to MCCOY, LEE used TT-2 to call POLK. At approximately 1:01 p.m. agents intercepted a call between LEE at TT-2 and POLK at (925) 698-0098, and addressed the female speaking during the call as "Deb." LEE informed POLK that LEE needed the "tickets," and that LEE would come to pick them up from POLK.

204. At approximately 1:39 p.m., agents intercepted a call between POLK at (925) 698-0098 and LEE at TT-2. During the call, POLK stated she was on her way home. LEE stated they (BROWN and LEE) would meet POLK there. At approximately 2:19 p.m., surveillance units observed a light-colored SUV park in the driveway of **Target Premises #6**. Agents observed LEE exit the driver's side door and BROWN exit the passenger side door of the light-colored SUV. Agents observed LEE enter the open garage of the residence, while BROWN stayed out front of the residence. Shortly thereafter, agents observed a plastic bag thrown over a side fence adjacent to the garage of **Target Premises #6**, which BROWN caught. Agents could not see what was inside the bag. Agents then observed BROWN open up the rear door of the light-colored SUV, put the bag inside the rear area of the SUV, and close the rear door. Surveillance units then observed LEE exit the open garage, enter the light-colored SUV with BROWN, and depart the area.

205. As set forth above in Paragraphs 105-106, on May 15, 2018, I believe that LEE went to

**Target Premises #6** to pick up bulk cash to complete the alleged drug transaction with Jesse LOPEZ III.   Similarly, another intercepted call on August 10, 2018 indicates that LEE uses **Target Premises #6** to maintain cash and/or drugs needed for the operation of the DTO.

| | |
|---|---|
| LEE: | Yeah [U/I], I'm coming through there tomorrow, we going to Hot August Nights, but I was gonna get the tickets in the morning to go to Reno. So I'm making sure you're gonna be home. |
| POLK: | I have to be at church at 8:30 in the morning. |
| LEE: | Oh I better come put 'em in the bush tonight then. As soon as I make it back I'll be there. |

206.   At approximately 10:14 p.m. physical location information for LEE's phone showed that TT-2 was in the vicinity of **Target Premises #6**.   I believe that here, like May 15, 2018, LEE was discussing with POLK the logistics of picking up "tickets" (suspected drug proceeds) from **Target Premises #6**.

207.   A more recent intercept on January 30, 2019 indicates that LEE continues to use **Target Premises #6** as a hub for illicit case/and or narcotics.   Specifically, at 8:39 p.m., LEE called POLK to ask if her "trash came today" and POLK responded in the affirmative.   POLK then stated that she had called "Ant Man," referencing Anthony BROWN, to confirm that "he was still alive."   I believe that POLK was referring to a recent incident in which BROWN had accidentally discarded a significant quantity of LEE's drugs in the trash at **Target Premises #1**. In his conversation with POLK, LEE stated that he (LEE) "ain't never taken a loss like that before."   These interactions indicate that the LEE DTO frequently stores drugs and/or drug proceeds in trash cans.   This is consistent with agents' observations on February 9, 2019, at approximately 9:54 a.m., when agents observed Anthony BROWN exit **Target Premises #1** and remove two dark colored bags with white lettering from a trash can outside the garage of **Target Premises #1** and place the bags into the back of the black truck driven by courier Evan MARTINEZ-DIAZ.

208.   As such, I believe that LEE asking POLK if "her trash came today" was intended by LEE

to confirm that POLK would not repeat the same mistake that BROWN had recently made, by allowing drugs or cash to be discarded.   This indicates that LEE continues to use **Target Premises #6** as a stash house for the DTO.

209.    Finally, court authorized location monitoring of LEE's phones, TT-2 and TT-5, show that LEE's devices continue to frequent the vicinity of **Target Premises #6**.   In fact, one of LEE's devices was in the vicinity of **Target Premises #6** on the following dates:

| Date | Time | LEE's Device |
|------|------|--------------|
| January 29, 2019 | 12:06 a.m. | TT-2 |
| January 30, 2019 | 6:26 a.m. | TT-5 |
| February 1, 2019 | 1:26 a.m. | TT-5 |
| February 2, 2019 | 3:22 p.m. | TT-2 |
| February 16, 2019 | 4:08 p.m. | TT-2 |
| February 19, 2019 | 12:30 p.m.; 12:44 p.m.; 4:10 p.m. | TT-2 |

210.    I know that it is common practice for drug traffickers to store their drug proceeds in various locations and stash houses, which are monitored by co-conspirators involved in the organization.   Drug traffickers will commonly do this as a safety measure in order to minimize the risk that all drugs or monies could be seized if a stash location is searched by law enforcement or robbed by other drug dealers.   Based on the foregoing, I believe there is probable cause that **Target Premises #6** contains evidence relating to the narcotics trafficking activities of the LEE DTO.

### Target Premises #7: 292 Balsam St., Pittsburg, California (Residence of Deshawnte GAMBOA)

211.    I believe that **Target Premises #7** is the current residence for Deshawnte GAMBOA. GAMBOA was intercepted over TT-1, during the first and second 30-day interception periods

utilizing (415) 619-9770, to talk with MCCOY.   (415) 619-9770 is subscribed to GAMBOA's

wife Laya LIMJOCO at **Target Premises #7**.   During a surveillance operation on April 15,

2018, agents placed a ruse call to (415) 619-9770, and observed GAMBOA answer the device.

Also, agents have observed GAMBOA driving a Chevrolet, bearing California license plate

7CYH998, and a Hyundai, bearing California license plate 7VIA741, both registered to

LIMJOCO at **Target Premises #7**.   Additionally, GAMBOA's California driver's license states

that **Target Premises #7** is his current address.   Furthermore, law enforcement database queries

list **Target Premises #7** as a current residence for GAMBOA.

### Target Premises #8: 21 Inlet Dr., Bay Point, California (Residence of Evan MARTINAZ-DIAZ)

212.    I believe that **Target Premises #8** is the current residence of Evan MARTINEZ-DIAZ.

During the course of the investigation, law enforcement successfully surveilled MARTINEZ-

DIAZ at **Target Premises #8**.   Law enforcement database queries detail that **Target Premises

#8** is a current address for MARTINEZ-DIAZ.   Also, MARTINEZ-DIAZ's California DMV

license states that **Target Premises #8** is his current address.   The vehicle MARTINEZ-DIAZ

was driving on February 9, 2019 is registered to Maribele Martinez at **Target Premises #8**.

Additionally, (925) 329-1710, a number believed to be used by MARTINEZ-DIAZ, is registered

to MARTINEZ-DIAZ at **Target Premises #8**.   Furthermore, recent physical location

information for (925) 329-1710 indicates that the device is frequently located in the vicinity of

**Target Premises #8**.

213.    As set forth in Paragraphs 157-175 above, pertaining to the seizure of 20 pounds of

methamphetamine and one kilogram of cocaine on February 9, 2019, I believe that MARTINEZ-

DIAZ is a large-scale courier and/or drug trafficker operating in the San Francisco Bay Area.   I

also believe that MARTINEZ-DIAZ stores narcotics at **Target Premises #8**.   Based on the

amount of narcotics that MARTINEZ-DIAZ acquired from LEE's residence, I believe that

MARTINEZ-DIAZ uses **Target Premises #8** as a location to safely keep narcotics and/or

proceeds.   It is common practice for drug traffickers to store large amounts of narcotics at their residences, rather than in a vehicle or other location, so that the narcotics will be safeguarded against theft.   Based on my experience conducting narcotic-related investigations in the San Francisco Bay Area, I know that the street value for 20 pounds of methamphetamine is approximately $60,000 and the street value for one kilogram of cocaine is approximately $28,000.   Given the high-value of the narcotics that MARTINEZ-DIAZ possessed on February 9, 2018, I believe that MARTINEZ-DIAZ likely stores narcotics at **Target Premises #8** in connection with his courier and/or trafficking activities.   Based on the aforementioned, I believe there is probable cause that **Target Premises #8** contains evidence relating to the narcotics trafficking activities of the LEE DTO.

### Target Premises #9: 1110 Pacific Ave., Rio Dell, California (Residence of Luis Angel TORRES-GARCIA, aka "GUERO")

214.    I believe that **Target Premises #9** is the current residence for Luis TORRES-GARCIA. As set forth above, on February 7, 2019, TORRES-GARCIA was identified by his California driver's license during a traffic stop.   TORRES-GARCIA's California Department of Motor Vehicles (DMV) driver's license depicts **Target Premises #9** as his current address.   Six different vehicles bearing California license plates 7LEH561, 04146K1, 42892E2, 63883L2, 89274A1, and 7ABE330 respectively, are registered to TORRES-GARCIA at **Target Premises #9**.   Additionally, law enforcement database queries list **Target Premises #9** as a current residence for TORRES-GARCIA.   Historical cell site and physical location information for the devices believed to be utilized by TORRES-GARCIA, (707) 273-0908 and (707) 726-3102 show the devices located in the vicinity of **Target Premises #9** during late nights and early mornings.

215.    During the course of the investigation, TORRES-GARCIA was intercepted over phone numbers (707) 726-3102, (707) 273-0908, and (707) 726-3741 discussing narcotic-related activity with DELGADILLO at TT-4.   A review of telephone toll records for the three devices detail a device issued telephone number (707) 672-4992 as the top common caller from August

23, 2018 to March 27, 2019.   The number (707) 672-4992 is subscribed in the name of "Luis Torres" at "3556 F St., Eureka, California 95503."   Law enforcement database queries show that TORRES-GARCIA previously resided at 3656 F St., Eureka, California and 3556 E St., Eureka, California and agents believe that TORRES-GARCIA combined the addresses to create a fictitious location to subscribe (707) 672-4992.   Agents believe that (707) 672-4992 is utilized by TORRES-GARCIA's wife, Juliana Maria TORRES.   Law enforcement database queries depict **Target Premises #9** as a current residence for Juliana TORRES.   Law enforcement database queries also detail that Juliana TORRES also previously resided at 3656 F St.   Juliana TORRES' California driver's license depicts Target Premises #9 as her current address. Additionally, a social media check for (707) 672-4992 through WhatsApp, depicts Juliana TORRES with TORRES-GARCIA.

216.    Agents believe that TORRES-GARCIA, aka "GUERO" is a co-conspirator in the DTO and a large scale narcotics trafficker operating in the Northern District of California, and as such, **Target Premises #9** is likely to contain evidence of the DTO's activities.

## G.    KNOWLEDGE, TRAINING, AND EXPERIENCE REGARDING NARCOTICS TRAFFICKING

217.    Based on my training and experience, my participation in this and other drug trafficking investigations, and consultation with other experienced law enforcement officers, I know that drug traffickers often maintain documents pertaining to the possession, importation, exportation, and/or distribution of controlled substances and illegal proceeds, including invoices, shipping labels, tracking numbers, boxes, and envelopes at their residences, stash houses, and/or in their vehicles where they are available for reference and concealed from law enforcement.   Drug traffickers often retain these documents for long periods of time.

218.    Drug traffickers commonly store drugs and drug paraphernalia, including pipes, syringes, and rolling papers, in their residences, stash houses, and/or vehicles in order to have ready access to the drugs and/or paraphernalia in order to conduct their drug trafficking business or to use

those drugs personally.

219.     Drug traffickers attempt to mask the distinct odors of particular drugs through the use of heat sealing and/or canning devices and/or aromatic substances such as laundry soap, dryer sheets, air fresheners, or axle grease.

220.     Drug traffickers often dilute, or "cut," drugs in order to maximize the volume of drugs they have to sell, and thus their profits.   Drug traffickers use various substances to dilute drugs, including mannitol, mannite, lactose, Vitamin B12, and MSM.   Drug traffickers use equipment, such as scales, sifters, hammers, grinders, razor blades, glass panes, mirrors and kilo or pound presses as part of the dilution or "cutting" process.   Once the drug has been "cut," drug traffickers usually will repackage it, often in smaller quantities, using masking agents, tape, heat sealers and heat sealed bags, Ziploc bags, paper bindles, and/or other containers for redistribution.   It is common for drug traffickers to maintain such equipment and supplies in their residences, stash houses, and storage units;

221.     Drug traffickers keep books, receipts, notes, ledgers and other forms of records specifically relating to their drug distribution activities.   Because drug traffickers often "front" drugs to their customers – that is, sell the drugs on credit – or receive drugs from their suppliers on credit, such documentation is necessary to keep track of the amounts paid and owed with respect to their customers and suppliers.   These ledgers are more commonly known as "pay/owe sheets" and may be as simple as notations on miscellaneous pieces of paper or may be recorded more formally in notebooks, computer spreadsheets or other forms of electronic cataloguing, and are frequently encoded in order to protect those involved.   Drug traffickers often keep such records on their person or in their residences, stash houses, and/or vehicles, and keep these records for long periods of time.

222.     Drug trafficking is a cash business.   Customers pay for drugs with cash and dealers commonly purchase drugs from their suppliers with cash.   Drug traffickers commonly keep large sums of currency, financial instruments, precious metals, jewelry, and other items of value which represent either the proceeds from drug sales or are intended for the purchase controlled

substances.  When drug traffickers amass such wealth, they often attempt to legitimize that

wealth or otherwise conceal it and its origin from discovery by law enforcement.  To accomplish

this, drug traffickers often use different techniques, including the use of foreign and domestic

banks and their attendant services, including savings and checking accounts, securities, cashier's

checks, money drafts and letters of credit to exchange drug proceeds into money that appears to

come from a legitimate source.  Drug traffickers also purchase real estate or vehicles, and

establish shell corporations and business fronts that they use to launder drug proceeds.  Drug

traffickers often utilize fictitious or "straw-holder" owners to conceal the true ownership,

vehicles, or other valuable items purchased with the proceeds of illicit drug sales.  In addition,

drug traffickers often use wire transfers, cashier's checks, and money orders to pay for drugs or

other costs relating to their distribution business.  Drug traffickers often keep these items of

value, and records relating to them, on their person or in their residences, stash houses, and/or

vehicles where they are concealed from law enforcement and readily available.

223.    Drug traffickers go to great lengths to hide and secure the drugs, drug proceeds, other

items of value and records relating to their drug business.  This is to safeguard those items

against robbery and keep them from law enforcement.  These secure locations typically include

safes, vaults, or other locked containers, as well as specially constructed concealed

compartments such as those often found in vehicles used specifically to facilitate drug

trafficking.  Other methods of concealment include the burial of such items underground, the use

of locked vehicles, trailers, out buildings, sheds, and/or exterior closets, the use of natural spaces

within walls, furniture, vehicles, and other areas, and the use of sealed cans and canning

machines.

224.    Drug traffickers often use the United States Postal Service or commercial express mail

delivery companies, such as FedEx or UPS, to ship drugs and money to various points within the

United States.  They do so, at least in part, due to the convenience of the service and the

availability of related internet and phone tracking services, speed of delivery, and to reduce their

risk of arrest during the transportation of drugs from one place to another.  They often use hand-

written airbills, drop the packages near closing time, pay for such services in cash and utilize false or nominee names, addresses, and/or telephone numbers when using such services in order to further insulate themselves from detection by law enforcement. Drug traffickers frequently maintain records relating to their use of these services, such as receipts, copies of airbills, empty and/or previously used boxes, packing tape, packing popcorn/filler and other packaging materials, and package tracking records printed from the internet, at their residences, stash houses, and/or in their vehicles where they are available for reference. Drug traffickers often keep these documents—whether knowingly or inadvertently—for long periods of time.

225. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package and deliver the drugs and persons to launder the drug proceeds. These persons frequently maintain listings of names, aliases, telephone numbers, pager numbers, facsimile numbers, physical addresses, and email addresses, sometimes encoded and sometimes not encoded, for the purpose of contacting their suppliers, customers, transporters, and others involved in their illicit drug distribution activities. These records are typically maintained on their person or in their residences, stash houses, and/or vehicles, so they are readily available in order to efficiently conduct their drug trafficking business. Moreover, such records are often stored electronically within the memory of telephones, computers, and/or personal digital assistants such as iPhone and Blackberry devices.

226. Drug traffickers often use cellular telephones, satellite telephones, pagers and text messaging devices, voicemail or answering machine systems, telephone calling cards, computers, email, and/or personal digital assistants such as iPhone and Blackberry devices in order to communicate with their suppliers, customers, transporters, and others involved in their illicit drug distribution activities. Drug traffickers often keep these items on their person or in their residences, stash houses, businesses, and/or vehicles where they are readily available.

227. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to and/or within foreign countries, in connection with their illegal activities in order to meet with

co-conspirators, conduct drug transactions, or to transport drugs or drug proceeds. Documents relating to such travel, such as calendars, travel itineraries, maps, airline ticket and baggage stubs, frequent use club membership information and records associated with airlines, rental car companies, and/or hotels, airline, hotel and rental car receipts, credit card bills and receipts, photographs, videos, passports, and visas, are often maintained by drug traffickers in their residences, stash houses, and/or vehicles where they are readily available for use or reference.

228. Drug traffickers frequently possess firearms, ammunition, silencers, explosives, incendiary devices, and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take such items and/or harm them during transactions. Such weapons, which are often stolen or otherwise possessed illegally, are typically maintained on their person or in their residences, stash houses, and/or vehicles where they are concealed from law enforcement and readily available.

229. Drug traffickers often utilize two way radios, police scanners, video surveillance systems, and other counter surveillance equipment to prevent detection by law enforcement, and that such items are typically maintained at their residences, stash houses, and/or in their vehicles.

230. Drug traffickers frequently take, or cause to be taken, photographs and/or videos of themselves, their criminal associates, their real and personal property, their weapons, and their drugs, and that such items are often stored on their person, in their residences, and/or vehicles. These are also often stored on electronic devices where they often remain indefinitely.

231. During the course of a search it is not uncommon to find items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the place being searched, such as cancelled mail, deeds, leases, titles, registration information, rental agreements, photographs, videos, diaries, utility and telephone bills, tax documentation, travel documents, statements, passports, driver's licenses and/or identification cards, immigration documentation, birth certificates, keys, and documents pertaining to domestic and international travel.

232. I know that drug traffickers often use their vehicles to transport contraband – including drugs, drug proceeds and firearms – and other evidence of their activities. I know that following

82

a drug trafficker's movements can facilitate surveillance and enable agents to follow a subject without exposing themselves to the subject they are following. This in turn enables agents to observe a drug trafficker's meetings with other associates and learn about new locations where a DTO stores drugs, money, firearms and other items related to the manufacture and distribution of controlled substances.

233. I know that drug traffickers often use multiple phones to conduct their drug dealing, and that they often switch SIM cards between phones.

## H.    REQUEST FOR SEALING

234. Because this is an ongoing and confidential investigation, I ask that this application, this affidavit, resulting complaints and/or warrants, and all associated documentation be filed under seal so that the targets are not prematurely alerted to the existence of this investigation and/or the scope and direction of the investigation.

I swear under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Respectfully submitted,

Matthew Shaw
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me
this day ____ of April, 2019

HON. JACQUELINE SCOTT CORLEY
UNITED STATES MAGISTRATE JUDGE